1

2

3

4                    UNITED STATES DISTRICT COURT

5              FOR THE EASTERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| CONSOLIDATED SALMON CASES | 1:09-CV-01053 OWW DLB |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.* v. LOCKE, *et al.* | MEMORANDUM DECISION AND ORDER DENYING FEDERAL DEFENDANTS' MOTION TO DISMISS (DOC. 80), DENYING AS MOOT MOTIONS TO STRIKE PORTIONS OF MOTION TO DISMISS (DOC. 92, 97), AND DENYING MOTION TO STRIKE PORTIONS OF REPLY (DOC. 125) |
| STOCKTON EAST WATER DISTRICT, *et al.* v. NOAA, *et al.* | |
| STATE WATER CONTRACTORS v. LOCKE, *et al.* | |
| Kern COUNTY WATER AGENCY, *et al.* v. UNITED STATES DEPARTMENT OF COMMERCE, *et al.* | |
| OAKDALE IRRIGATION DISTRICT, *et al.* v. UNITED STATES DEPARTMENT OF COMMERCE, *et al.* | |
| METROPOLITAN WATER DISTRICT OF CALIFORNIA v. NATIONAL MARINE FISHERIES SERVICE, *et al.* | |

## I. INTRODUCTION

These consolidated cases all challenge a June 4, 2009
biological opinion issued by the National Marine
Fisheries Service ("NMFS") finding that the coordinated
operations of the federal Central Valley Project ("CVP")
and State Water Project ("SWP") are likely to jeopardize

1

the continued existence and adversely affect the critical habitat of certain salmonid and other species ("2009 Salmon BiOp").[1]

Before the court for decision is Federal Defendants' motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1), two of the six consolidated actions, namely the cases brought by (1) co-Plaintiffs Kern County Water Agency ("Kern") and Coalition For a Sustainable Delta ("Coalition") and (2) the Metropolitan Water District of Southern California ("Met"), as "duplicative" of (3) the consolidated lawsuit filed be the State Water Contractors ("SWC").  Doc. 80-2, filed Nov. 2, 2009. Alternatively, Federal Defendants argue that if the Kern/Coalition and Met cases remain viable, the SWC case should be dismissed for lack of standing, in part because Kern and Met are members of SWC.  *Id.*  SWC opposes dismissal on either ground, Doc. 99, as do Met, Doc. 102, and the *Kern/Coalition* plaintiffs, Doc. 107.

Federal Defendants replied, arguing, among other things, that dismissal of the *Kern/Coalition* action is

---

[1] **The species addressed by this biological opinion are: (1) endangered Sacramento River winter-run Chinook salmon (*Oncorhynchus tshawytscha*) ("winter-run"); (2) threatened Central Valley spring-run Chinook salmon (*O. tshawytscha*) ("spring-run"); (3) threatened Central Valley ("CV") steelhead (*O. mykiss*); (4) threatened Central California Coast ("CCC") steelhead (*O. mykiss*); (5) threatened Southern Distinct Population Segment ("DPS") of North American green sturgeon (*Acipenser medirostris*) ("Southern DPS of green sturgeon"); and (6) endangered Southern Resident killer whales (*Orcinus orca*) ("Southern Residents") (collectively, the "Listed Species").**

appropriate, despite the fact that Kern's co-plaintiff, the Coalition, is not a member of the SWC.  Nevertheless, "should the Court be inclined to deny this motion as to Coalition," Federal Defendants request that dismissal should be without prejudice, so that Federal Defendants can pursue discovery into the Coalition's membership.  Doc. 114 at 6.  The Coalition filed a motion to strike this argument, because it was raised for the first time in reply.  Doc. 125.  In the alternative, the Coalition requests leave to file a surreply addressing this argument, which has been lodged as Attachment A to their motion to strike.  Doc. 125-2.

The Coalition and SWC separately move to strike those portions of Federal Defendants' motions that concern their claims, on the ground that Federal Defendants failed to give either the Coalition or SWC proper notice that they would be seeking dismissal of their claims.  Docs. 92 & 97.  The September 25, 2009 Scheduling Conference Order provided: "[i]f any party believes any ... issue is resolvable by early dispositive motion, that party shall give notice of the nature of the claims on or before October 10, 2009."  Doc. 51 at 21.  On October 5, 2009, Federal Defendants gave notice of their intent to move to dismiss the claims brought by KCWA and Met, but

3

made no mention of the Coalition or SWC's claims, Doc. 55 at 1, nor have Federal Defendants made any request to modify the Scheduling Order.  Federal Defendants oppose the motions to strike.  Doc. 113.  The Coalition and SWC replied.  Docs. 127 & 128.

## II. STANDARD OF DECISION

Federal Defendants rely exclusively on Federal Rule of Civil Procedure 12(b)(1), which allows a motion to dismiss for lack of subject matter jurisdiction.  It is a fundamental precept that federal courts are courts of limited jurisdiction.  Limits upon federal jurisdiction must not be disregarded or evaded.  *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  The plaintiff has the burden to establish that subject matter jurisdiction is proper.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  This burden, at the pleading stage, must be met by pleading sufficient allegations to show a proper basis for the court to assert subject matter jurisdiction over the action.  *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); Fed. R. Civ. P. 8(a)(1).  When a defendant challenges jurisdiction facially, all material allegations in the complaint are assumed true, and the question for the court is whether the lack of federal

4

1   jurisdiction appears from the face of the pleading

2   itself.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir.

3   2009).

4

5                      III. <u>DISCUSSION</u>

6   A.   <u>The Challenged Parties.</u>

7       In its Complaint, SWC alleges that "Plaintiff [SWC]

8   is ... a non-profit mutual benefit corporation organized

9   and existing under the laws of the State of California to

10  represent the common interests of 27 public water supply

11  agencies located in California's Central Valley, in the

12  San Francisco Bay area, along California's Central Coast,

13  and in Southern California."  SWC Complaint at ¶14.  SWC

14  also alleges:

15

16          [T]he effects of Defendants' actions will be
            felt by [State Contractors] and its member
17          agencies .... The member agencies of the State
            Contractors include 27 public districts and
18          agencies which provide water in numerous
            counties, including to users in Kings and Kern
19          Counties[,] ... reductions in exports from the
            Delta will place greater demands upon
20          alternative sources of water, including
            groundwater, that are used to meet reasonable
21          and beneficial water demands within Merced,
            Fresno, Kings and Kern Counties.
22

23  *Id*. at ¶13.

24      The *Kern/Coalition* Complaint contains the following

25  allegations regarding Kern:

26

27          [Kern] is a public agency that was created in
            July 1961 by a special act of the California
28          State Legislature and ratified by the electorate
            of Kern County in September 1961.  [Kern] was

                              5

granted the primary power to acquire and
contract for water supplies for Kern County.
(Kern Coalition Complaint at ¶9.)

[Kern] is a wholesaler of SWP water for ...
agricultural and municipal and industrial uses.
(*Id.*)

The service area for [Kern] encompasses all the
territory within the San Joaquin Valley portion
of Kern County.  (*Id.*)

[Kern] provides a portion of, and in some cases
the entire water supply for approximately
719,000 acres of prime farmland . . . , and for
some 500,000 residents of Kern County.  (*Id.*)

Approximately 98 percent of [Kern's] water is
imported by the [State Water Project ("SWP")].
(*Id.*)

In terms of contract amount with [the Department
of Water Resources ("DWR")], [Kern] is the
second largest SWP contractor.  (*Id.*)

The *Kern/Coalition* Complaint also contains the following

allegations regarding the Coalition and its members:

Plaintiff Coalition is comprised of individual
and agricultural water users and of individuals
within the San Joaquin Valley.  The Coalition is
bringing this action on behalf of itself and its
members.  (*Id.* at ¶ 12.)

The purpose of the Coalition is to advance the
interests of its members, namely, (1) to better
the conditions of those engaged in agricultural
pursuits in the San Joaquin Valley and (2) to
ensure a sustainable and reliable water supply
by protecting the Delta and promoting a strategy
to ensure its sustainability.  (*Id.*)

Certain Coalition members have contracts with
various agencies for the delivery of [Central
Valley Project ("CVP")] and SWP water, and as
such, depend on CVP and SWP deliveries from the
Delta to the San Joaquin Valley for their water
supply.  Certain Coalition members have
contracts to receive water through 2035.  These
contracts are expected to be extended beyond
that date.  Thus, the Coalition and its members
have a long-term interest in the overall health
of the Delta and its ecosystem, which includes

6

1          the maintenance of viable populations of the
           salmonids and the green sturgeon [at issue in
2          the litigation].  (*Id.* at ¶ 13.)

3          Certain Coalition members' contracts for
           delivery of SWP water require payment for their
4          full contractual entitlement regardless of the
           amount of water actually delivered in any given
5          year through the SWP.  (*Id.* at ¶ 14.)

6          [R]educed delivery of surface water through the
           SWP is likely to result in increased reliance on
7          groundwater for irrigation supplies, which will
           result in overdraft of the groundwater basins
8          that underlie the lands of the Coalition
           members.  (*Id.*)
9
           Coalition members view, enjoy, and use the Delta
10         ecosystem.  Coalition members routinely engage
           in various recreational activities in the Delta
11         – including boating, fishing, and wildlife
           viewing – and have concrete plans to continue to
12         do so in the future....  The decline of the
           salmonids and the Listed Species has had and
13         continues to have a substantial negative impact
           on Coalition members, impairing their use and
14         enjoyment of the Delta and Listed Species.  (*Id.*
           at ¶15.)
15
    Met's Complaint alleges:
16
           37. The Metropolitan Water District of Southern
17         California is the largest provider of treated
           drinking water in the United States.
18
           38. Metropolitan was created pursuant to an Act
19         of the California Legislature in 1927 and was
           officially incorporated in December of 1928.
20
           39. The mission of Metropolitan, as promulgated
21         by its Board, is to provide its service area
           with adequate and reliable supplies of high
22         quality water to meet present and future needs
           in an environmentally and economically
23         responsible way.

24         40. Metropolitan's six-county service area
           encompasses 5,200 square miles in Los Angeles,
25         Orange, Riverside, San Bernardino, San Diego and
           Ventura counties. Some agencies within this
26         service area depend on Metropolitan to supply
           100 percent of their water needs. In fact, 19
27         million Californians—approximately half of the
           population of the state—rely on Metropolitan for
28         some or all of the water they use in their homes

                                  7

and businesses. Metropolitan's water supply helps sustain the economy of Southern California which generated a gross domestic product in 2006 of almost $970 billion. This economy is larger than most nations of the world.

41. Because Southern California has an arid climate and does not have sufficient local supplies of water to support its population and economy, water must be imported into the region. Metropolitan imports water from two principal sources: northern California via the SWP, and the Colorado River via the Colorado River Aqueduct.

42. Metropolitan faces massive challenges in providing a reliable and high quality water supply for Californians, including population growth, increasing environmental regulations, and variable weather conditions.

43. SWP water supplies are especially important to Metropolitan because SWP water has lower salinity content than Colorado River Aqueduct water. Through blending, SWP water helps attain water quality standards, facilitates use of recycled water, and increases groundwater conjunctive use applications.

B.    **Motion to Dismiss Duplicative Complaints.**

Federal Defendants rely on *Adams v. California Department of Health Services*, 487 F.3d 684, 688 (2007), to support the unremarkable proposition that a district court generally has the discretion "to dismiss a duplicative later-filed action, to stay that action pending resolution of the previously filed action, to enjoin the parties from proceeding with it, or to consolidate both actions."  In *Adams*, the plaintiff, who was a challenging a state agency's decision not to hire her, sought to amend the complaint, but not until well

after the deadline for amendment.  The district court denied plaintiff's motion to amend and entered a final judgment.  *Id*. at 687.  "[I]n an attempt to avoid the consequences of her own delay and to circumvent the district court's denial of her untimely motion," the exact same plaintiff then filed a second lawsuit, raising similar claims, but naming some additional defendants.  *Id*. at 688.

The Ninth Circuit began with the general proposition that "[p]laintiffs generally have no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant."  *Id*.  Then, borrowing from the test for claim preclusion, *Adams* articulated a test for determining whether a suit is duplicative:

> [I]n assessing whether the second action is duplicative of the first, we examine whether the causes of action and relief sought, as well as the parties or privies to the action, are the same.

*Id*. at 688-89.

Under the first part of the duplicative action test, "[t]o ascertain whether successive causes of action are the same, [a court should] use the transaction test, developed in the context of claim preclusion."  *Id*. at 689.

9

> Whether two events are part of the same transaction or series depends on whether they are related to the same set of facts and whether they could conveniently be tried together.  In applying the transaction test, we examine four criteria: (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.  The last of these criteria is the most important.

*Id.* (internal citations and quotations omitted).

The two actions at issue in *Adams* shared a common transactional nucleus of facts.  Likewise, it is undisputed that all six consolidated cases share a common transactional nucleus of facts, namely the issuance of the 2009 Salmon BiOp, and that the claims in all six cases substantially overlap.  *See* Doc. 51 at 7-18.

Under the second part of the duplicative action test, a court must "examine whether ... the parties or privies to the action[] are the same."  *Id.* at 689.  *Adams* applied the concept of "virtual representation" to determine whether several new defendants added to the second action were "in privity" with the original defendant.  *Id.* at 689.

> Although the concept of privity traditionally applied to a narrow class of relationships in which a person is so identified in interest with a party to former litigation that he represents

10

1
2
3
4
5
6
7

> precisely the same right in respect to the
> subject matter involved, we have expanded the
> concept to include a broader array of
> relationships which fit under the title of
> "virtual representation."  The necessary
> elements of virtual representation are an
> identity of interests and adequate
> representation.  Additional features of a
> virtual representation relationship include a
> close relationship, substantial participation,
> and tactical maneuvering.

8   *Id.* at 691.  Applying the concept of "virtual

9   representation," *Adams* found the new defendants were in

10  privity with the old.  In light of these findings, *Adams*

11  concluded that the district court did not abuse its

12  discretion by dismissing the second action with prejudce.

13  *Id.* at 692.

14
15
16
17
18
19

> Dismissal of the duplicative lawsuit, more so
> than the issuance of a stay or the enjoinment of
> proceedings, promotes judicial economy and the
> comprehensive disposition of litigation.  In
> dismissing the duplicative suit with prejudice,
> the district court acted to protect the parties
> from vexatious and expensive litigation and to
> serve the societal interest in bringing an end
> to disputes.

20                          ***

21
22

> Adams had a full and fair opportunity to raise
> and litigate in her first action the claims she
> now asserts in this action.

23
24  *Id.* at 692 (internal citations omitted).

25      The Supreme Court has since rejected "virtual

26  representation" as a basis for finding privity in the

27  preclusion context.  *Taylor v. Sturgell*, __ U.S. __, 128

28
                              11

S. Ct. 2161, 2178 (2008).   Instead, the Supreme Court
articulated six categories of exceptions to the general
rule forbidding nonparty preclusion.   *Id*. at 2172.
First, a "person who agrees to be bound by the
determination of issues in an action between others is
bound...."   *Id*.   Second, certain "pre-existing
substantive legal relationships between the person to be
bound and a party to the judgment" will bind certain non-
parties.   *Id*. (internal quotations omitted).   Third, "in
certain limited circumstances, a nonparty may be bound by
a judgment [if] she was adequately represented by someone
with the same interests who was a party to the suit."
*Id*. (internal quotation omitted).   Fourth, "a nonparty is
bound by a judgment if she assumed control over the
litigation in which the judgment was rendered."   *Id*. at
2173 (internal quotation omitted).   Fifth, "a party bound
by a judgment may not avoid its preclusive force by
relitigating through a proxy."   *Id*.   Sixth, "in certain
circumstances, a special statutory scheme may expressly
foreclose successive litigation by nonlitigants ... if
the scheme is otherwise consistent with due process."
*Id*. (alteration in original).[2]

---

[2] Plaintiffs protest that *Adams'* duplicative action test, even
with *Taylor's* privity standard replacing the "virtual
representation" doctrine, should not be applied here because, unlike
in *Adams*, *Taylor*, and every other case cited by Federal Defendants,

All, save the third exception, are obviously inapplicable.  The first exception is inapplicable because there is no suggestion that Kern, Met, or SWC have agreed to be bound by the others' actions.

The second exception requires a pre-existing, substantive legal relationship, such as that arising between preceding and succeeding owners of property, bailees and bailors, and assignees and assignors, none of which apply here.  *Taylor*, 128 S. Ct. at 2172.

The fourth exception applies when a nonparty assumed control of the prior litigation and then attempts to file

---

no claim or issue has reached final judgment in any of the Consolidated Salmon Cases.  *See also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1082 (9th Cir. 2003)(individual members of a property owners association precluded from bringing subsequent action because the association had already litigated the same claims in an earlier suit); *Bolden v. Pennsylvania State Police*, 578 F.2d 912 (3d Cir. 1978)(upholding denial of motion to intervene by Fraternal Order of Police ("FOP") and some of its individual members in a case to challenge the terms of a final consent decree in light of evidence that FOP voted to approve entry into consent decree); *Yankton Sioux Tribe v. U.S. Department of Health & Human Services*, 533 F.3d 634 (8th Cir. 2008)(affirming dismissal of lawsuit brought by Tribe and individual member of Tribe to relitigate claims brought to judgment by Tribe in previous lawsuit).

Plaintiffs are correct that *Adams* is distinguishable.  However, before judgment is entered in any possibly duplicative action, the trial court retains the discretion to dismiss, stay, or consolidate the duplicative actions.  For example, *in Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977), which *Adams* quoted for the general rule that "[p]laintiffs generally have no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant," the Third Circuit approved of a district court's consolidation of two nearly identical lawsuits brought by the same plaintiff, on its own motion and <u>before any judgments had been entered</u>.  *Walton* also noted that dismissal or stay of the later-filed action would have been permissible.  *Id.* Here, the district court retains the same power to control its docket with respect to duplicative actions.  However, the question remains whether the *Taylor* privity standard is met in connection with the challenged lawsuits.

its own case on the same grounds. *Id.* at 2173.  In determining whether such control was asserted, a court considers whether the non-party: (1) required the previous lawsuit to be filed; (2) reviewed and approved the complaint; (3) paid attorneys' fees and costs; (4) directed the appeal; (5) appeared and submitted a brief as an amicus; (6) directed the filing of the notice of appeal; and (7) effectuated the abandonment of that appeal by a party in the proceeding. *Montana v. United States*, 440 U.S. 147, 154 (1979).  Here, the Federal Defendants do not suggest this exception applies, as all cases were independently initiated.

The fifth exception does not apply because there has been no judgment in any of the consolidated actions, so it is not possible for any plaintiff to be relitigating through a proxy.

The sixth exception is inapplicable because there is no successive litigation or applicable "special statutory scheme" regarding successive litigation by non-parties.

The third exception concerns whether the non-party was adequately represented by a party with the same interests. *Taylor*, 128 S. Ct. at 2172.  A party's representation of another is "adequate" if, at a minimum: (1) the interests of the nonparty and her representative

14

are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty. *Id.* at 2176.

Federal Defendants cite *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1082 (9th Cir. 2003), for the proposition that an association filing suit on behalf of its members automatically triggers the third exception. *Tahoe Sierra* held:

> One of the relationships that has been deemed 'sufficiently close' to justify a finding of privity is that of an organization or unincorporated association filing suit on behalf of its members.... Of course, the organization must adequately represent the interests of its individual members if its representation is to satisfy the due process concerns articulated in *Hansberry v. Lee*, 311 U.S. 32, 40 43 (1940).... However, if there is no conflict between the organization and its members, and if the organization provides adequate representation on its members' behalf, individual members not named in a lawsuit may be bound by the judgment won or lost by their organization.

Id. at 1082 (internal citations omitted).

Federal Defendants suggest that the record demonstrates only the possibility of conflict <u>amongst</u> the members of the SWC, not conflict between the organization and its members. *See* Declaration of Terry Erlewine, Doc. 103, ¶¶ 8-9 (SWC's members "do not always have common

15

interests;" SWC's members' "interests do not necessarily align"). Federal Defendants also suggest that SWC can provide adequate representation on its members' behalf given that SWC is seeking the same declaratory and prospective relief sought by its members.

Federal Defendants ignore two important issues. First, SWC and its members, Kern and Met, specifically disclaim having any understanding that SWC would be acting in a complete representative capacity. Kern and Met serve different types of water users with potentially conflicting interests, as each water users seeks water it has contracted for, even at the expense of other water users. SWC is representing only the common interests of its diverse membership:

> [SWC] represents only the common interests of its 27 member agencies, not the individual interests of just two of those 27 members.... As emphasized above, the State Contractors represent only the 'common interests' of their 27 member agencies, not any individual, distinct interests of KCWA, MWD, or any other member agency may have.... [SWC] recognize[s] that they cannot represent each of their members' special, individualized interest and are instead concerned with protecting the members' common interests.

Doc. 99 at 16, 21.

Second, Federal Defendants fail to acknowledge the complex reality in which the two member plaintiffs operate. For example, Met obtains water from multiple

16

non-CVP sources, including the Colorado River, local
watersheds, and water re-use facilities, which it mixes
with SWP water before delivery to domestic, industrial,
and agricultural users.  Because of the potentially
higher legal and contractual priorities assigned to
domestic over agricultural use, Met is likely to have
different, and potentially conflicting priorities, as
compared to the Kern/Coalition plaintiffs, which
represent primarily agricultural users in the southern
San Joaquin Valley.  While SWC, a highly experienced
litigant, may take the laboring oar with respect to
interests that Met, Kern, and its 25 other members may
share, SWC cannot act in a "representative" capacity to
pursue specific relief that benefits some of its members
at the expense of others.  Met and Kern are entitled to
pursue their unique and potentially differing interests
separately, while relying on SWC to represent the common
interests of all SWP users.  Under the circumstances, Met
and Kern are not in privity with SWC for all purposes of
the duplicative action inquiry.

Even if, *arguendo*, the *Adams/Taylor* duplicative
action test were satisfied here, the district court has
exercised its discretion to consolidate, rather than
dismiss, the challenged complaints.  This approach, which

17

is articulated in detail in the scheduling order and which has been followed in the parallel Delta Smelt Consolidated Cases, 1:09-cv-00407, adequately preserves the parties' unique interests, and conserves party and judicial resources.  Federal Defendants have not demonstrated any prejudice will result from maintaining these cases as consolidated actions.  Every effort is being made to eliminate duplication and promote party and judicial economy.  It is preferable to do so simultaneously in consolidated cases rather than separately, in six cases.

The motion to dismiss the Kern/Coalition and Met complaints as duplicative is DENIED.

C.   **Motion to Dismiss State Water Contractor's Complaint For Lack of Standing.**

Alternatively, Federal Defendants contend that "if the direct participation of the KCWA Plaintiffs and MWD is necessary to protect their asserted claims and requested relief ..., then SWC lacks standing and must be dismissed."  Doc. 80-2 at 10.  An organization can establish standing to sue on behalf of its individual members if: (1) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested

requires the participation of individual members in the

lawsuit.  *Hunt v. Washington State Apple Adver. Comm'n*,

432 U.S. 333, 342-43 (1977); *United Union of Roofers,*

*Waterproofers, and Allied Trades No. 40 v. Insurance*

*Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990).

It is undisputed that both Kern and Met are

individual member agencies of SWC.  Federal Defendants

maintain that, under Hunt's third prong, "in order for

SWC to have standing to sue on their behalf, the

participation in this lawsuit of the KCWA Plaintiffs or

MWD cannot be necessary to the prosecution of SWC's

claims or its requested relief."  Doc. 80-2 at 10.

Federal Defendants' argument continues:

> It appears, however, that the KCWA Plaintiffs
> and MWD do consider their direct participation
> necessary.  After SWC filed suit, for example,
> both filed their own lawsuits, which, as
> detailed above, assert substantively identical
> claims and seek the same relief sought by SWC.
> Moreover, the KCWA Plaintiffs and MWD have each
> engaged their own counsel of record to prosecute
> these (overlapping) claims.  If their direct
> participation is necessary, as these actions
> suggest, SWC cannot establish the third prong
> necessary to show associational standing— that
> neither its claims asserted nor its relief
> requested requires participation of individual
> members—and it must be dismissed.

*Id.* at 10-11.

Federal Defendants misapply the scope of *Hunt's* third

prong.  *Hunt* itself sheds little light on the application

of this element.  However, *Hunt's* three-part test relies
heavily upon *Warth v. Seldin*, 422 U.S. 490 (1975).  In
*Warth*, the Supreme Court rejected an association's
argument that it had standing to bring damages claims on
behalf of individual members "not common to the entire
membership, nor shared by all in equal degree."  *Id*. at
515.  To the contrary, *Warth* concluded that "whatever
injury may have been suffered is peculiar to the
individual member concerned, and both the fact and extent
of injury would require individualized proof."  *Id*. at
515-16.  "Thus, to obtain relief in damages, each member
of [the association] who claims injury as a result of
respondent' practices must be a party to the suit, and
[the association] has no standing to claim damages on his
behalf."  *Id*. at 516.

     Here, while Kern and Met have the right to separately
sue to protect their own, unique interests, their
participation is not a legal prerequisite to SWC's
maintenance of its challenge to the 2009 Salmon BiOp on
behalf of the common interests of its members and its
request for appropriate injunctive relief.  As SWC
undisputably satisfies the first two *Hunt* requirements --
(1) its members would otherwise have standing to sue in
their own right, as each is injured by Defendants'

actions, and (2) the interests SWC seeks to protect are
germane to its organizational purpose, preserving
contractual and related water rights and supplies -- SWC
has organizational standing to pursue these common-
interest claims.  It is not necessary to address SWC's
alternative basis for standing in its own right.

The motion to dismiss for lack of standing is DENIED.

D.   Motions to Strike.

Denial of the motion to dismiss moots two of the
related motions to strike, which concern only the merits
of the motion to dismiss.  Doc. 92, 97.

The third motion to strike, filed by the Coalition,
concerns Federal Defendants' request in its reply that
denial of their motion to dismiss should be without
prejudice, so that Federal Defendants can pursue
discovery into Coalition's membership.  Doc. 114 at 6.
The Coalition moves to strike this argument because it
was raised for the first time in reply.  Doc. 125.  In
the alternative, the Coalition requests leave to file a
surreply addressing this argument, which has been lodged
as Attachment A to their motion to strike.  Doc. 125-2.
Although advanced for the first time in a reply brief,
Federal Defendants' request for a denial of its motion
without prejudice pending discovery is not unexpected and

will be considered.  Because it constitutes new material, the Coalition's surreply will also be considered.  The motion to strike is DENIED.

The merits of the argument and the surreply are easily resolved.  As a matter of law, if the court determines "at any time" that it lacks subject matter jurisdiction, the court must dismiss an action.  *See* Fed. R. Civ. P. 12(b)(1).  It is perfectly permissible for a defendant to move to dismiss under this rule on multiple occasions, for example, if new evidence is discovered. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction ... may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."). Accordingly, denial of a Rule 12(b)(1) motion is inherently without prejudice.

As for the Federal Defendants' right to obtain discovery from the Coalition, no such discovery motion is before the court at this time.  Ordinarily, preliminary discovery directed at a parties' standing is permitted. The matter was not resolved at the hearing on these motions.

IV. <u>CONCLUSION</u>

For the reasons set forth above:

(1) Federal Defendants' motion to dismiss the *Kern/Coalition* and *Met* complaints as duplicative is DENIED;

(2) Federal Defendants' motion to dismiss SWC's complaint for lack of standing is DENIED;

(3) Kern/Coalition and Met's motions to strike portions of the motion to dismiss are DENIED AS MOOT;

(4) The Coalition's motion to strike portions of Federal Defendants' reply brief is DENIED, but the Coalition's surreply will be considered.


SO ORDERED
Dated: January 12, 2010
                              <u>/s/ Oliver W. Wanger</u>
                                Oliver W. Wanger
                           United States District Judge

23