1

2        UNITED STATES DISTRICT COURT

3     FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5   CONSOLIDATED SALMONID CASES    1:09-CV-1053 OWW DLB

6                                   MEMORANDUM DECISION RE
                                    CROSS-MOTIONS FOR SUMMARY
7                                   JUDGMENT ON NEPA ISSUES
                                    (Docs. 82 & 83).
8

9

10

11                    I. INTRODUCTION

12        These consolidated cases all challenge the June 4, 2009

13   issuance of a biological opinion by the National Marine

14   Fisheries Service ("NMFS"), finding that the coordinated

15   operations of the federal Central Valley Project ("CVP") and

16   State Water Project ("SWP") are likely to jeopardize the

17   continued existence and adversely affect the critical habitat

18   of certain salmonid and other species ("2009 Salmonid BiOp"),

19   as well as the implementation of the terms of that BiOp by the

20   United States Bureau of Reclamation ("Reclamation").[1]  Because

21   the 2009 Salmonid BiOp found that planned coordinated Project

22

23

24        [1] The species addressed by this biological opinion are: (1)
     endangered Sacramento River winter-run Chinook salmon (*Oncorhynchus
25   tshawytscha*) ("winter-run"); (2) threatened Central Valley spring-run
     Chinook salmon (*O. tshawytscha*) ("spring-run"); (3) threatened Central
26   Valley steelhead ("CV") (*O. mykiss*); (4) threatened Central California
     Coast ("CCC") steelhead (*O. mykiss*); (5) threatened Southern Distinct
27   Population Segment ("DPS") of North American green sturgeon (*Acipenser
     medirostris*) ("Southern DPS of green sturgeon"); and (6) endangered
28   Southern Resident killer whales (*Orcinus orca*) ("Southern Residents")
     (collectively, the "Listed Species").

                              1

operations would jeopardize the continued existence of and/or adversely modify the critical habitat of several of the species,[2] 2009 Salmonid BiOp at 1-2,[3] NMFS proposed a Reasonable and Prudent Alternative ("RPA") that imposes a number of operating restrictions and other measures on the Projects.  The RPA included numerous elements for each of the various project divisions and associated stressors, which NMFS concluded "must be implemented in its entirety to avoid jeopardy and adverse modification."  *Id*. at 578.  The description of the RPA comprises approximately 90 pages of the 2009 Salmonid BiOp.  *See id*. at 581-671.

On June 4, 2009, Reclamation, which manages the CVP, informed NMFS that it "provisionally accepts the [RPA] while we carefully evaluate the [2009 Salmonid BiOp] and the [RPA]" AR USBR1; *see also* 2009 Salmonid BiOp at 2 (stating that Reclamation informed NMFS that, while Reclamation "may have reservations with portions of the [BiOp] ... it is a package that Reclamation can accept.").  Reclamation informed NMFS that it would immediately begin to implement the near-term actions of the RPA, but noted that some long-term actions, such as construction of the Red Bluff Pumping Plant,

---

[2] Jeopardy was found as to all of the covered species; adverse habitat modification was found as to the designated critical habitat of winter-run, spring-run, steelhead, and green sturgeon.  BiOp at 1-2.
[3] Although the BiOp is part of the administrative record ("AR"), for ease of reference, its internal page references, rather than AR references, are used.

2

1  replacement of the Whiskeytown temperature curtain, and fish

2  passage improvement actions on Battle Creek, required

3  additional planning.  *See* AR USBR1.  Reclamation also

4  indicated the potential need to reinitiate consultation on

5  several elements of the RPA.  AR USBR2.

6  
        Plaintiffs in all of the consolidated cases[4] move for

7  summary judgment, arguing that issuance and/or implementation

8  of the BiOp/RPA is "major federal action" that will inflict

9  harm on the human environment, and that NMFS and/or

10 Reclamation should have, but did not conduct an environmental

11 assessment ("EA") or prepare an environmental impact statement

12 ("EIS") under the National Environmental Policy Act ("NEPA").

13 Doc. 83.  Federal Defendants and Defendant-Intervenors oppose.

14 Docs. 95 & 100.  Plaintiffs replied and submitted a supporting

15 declaration.  Docs. 115.  It is undisputed that no NEPA

16 
17 assessment or documentation was prepared by either NMFS or

18 Reclamation in connection with the issuance, provisional

19 adoption, and/or implementation of the 2009 Salmonid BiOp and

20 RPA.

21 
22 
        Defendant-Intervenors cross-move for summary judgment on

23 this claim, arguing that FWS was not required to prepare an

24 
25 _____

26      [4] San Luis & Delta Mendota Water Authority ("Authority") and
    Westlands Water District ("Westlands"); Stockton East Water District
27  ("Stockton"); State Water Contractors ("SWC"); Kern County Water Agency
    ("KCWA") and Coalition for a Sustainable Delta ("Coalition"); Oakdale
28  Irrigation District ("Oakdale"), et al.; and Metropolitan Water District
    of Southern California ("MWD") (collectively, "Plaintiffs").

EIS in connection with issuance of the BiOp.  Doc. 82-2.

Plaintiffs oppose.  Doc. 106.  Defendant-Intervenors filed a

reply.  Doc. 116.

The Pacific Legal Foundation also seeks leave to file an

amicus curiae brief on behalf of the City of Coalinga, Stewart

& Jasper Orchards, Arroyo Farms, LLC, King Pistachio Grove,

and Perez Farms.  Doc. 84.  Defendant Intervenors filed a

response to that motion and to the brief itself.  Doc. 94.

The cross-motions came on for hearing on February 9,

2010.  Doc. 214.  The parties were granted leave to file

supplemental briefs on certain issues.  Federal Defendant

submitted a supplemental brief on February 12, 2019.  Doc.

222.  Defendant Intervenors and Plaintiffs responded on

February 16, 2010.  Docs. 224 & 225.  The matter was

thereafter submitted for decision.

## II. ANALYSIS

A.    Threshold Issues.

1.    Requests for Judicial Notice.

a.    Plaintiffs' Request for Judicial Notice.

Plaintiffs request that judicial notice be taken of:

• The June 4, 2009 Endangered Species Act Section 7

  Consultation Biological Opinion and Conference Opinion

  on the Long-Term Operations of the Central Valley

  Project and States Water Project (Exhibit A to Doc. 83-

4

4).

- Excerpts from State Water Resources Control board
  Revised Water Right Decision 1641, dated March 15, 2000
  (Exhibit B to Doc. 83-4).

- Two court orders filed in 1982 in *United States v.
  State of California*, et al., Case No. 81-4189X, 81-
  4309X (Exhibits C and D to Doc. 83-4).

- A 1982 Operating Plan for New Melones Reservoir, issued
  by the Bureau (Exhibit E to Doc. 83-4).

Federal Defendants request judicial notice of:

- The October 1999 Central Valley Project Improvement Act
  Final Programmatic Environmental Impact Statement
  (Exhibit A to Doc. 101).

These documents are all judicially noticeable public
records under Federal Rule of Evidence 201(b), which
authorizes judicial notice of a "fact ... not subject to
reasonable dispute in that it is either (1) generally known
within the territorial jurisdiction of the trial court or (2)
capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned." *See
United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir.
2008) (judicial notice is proper for records and reports of
administrative agencies); *United States v. Howard*, 381 F.3d
873, 876 n. 1 (9th Cir. 2004) (taking judicial notice of court

5

records in another case).  However, these records are admissible only for the existence of their content, not for the truth of disputed matters asserted in the documents.

B.   Burden of Proof.

The burden of proof set forth in the Smelt NEPA decision is equally applicable here:

> In the preliminary injunction context, "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Assns., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1042 (9th Cir. 2009) (citing *Winter v. NRDC*, --- U.S. ---, 129 S. Ct. 365 (2008).).  Within the likelihood of success on the merits prong, a court must evaluate each claim according to applicable legal standards.  Here, that standard, in part, involves an inquiry into whether "there are substantial questions about whether a project may cause significant degradation of the human environment.  *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).  For a preliminary injunction, plaintiffs only had to establish that they are "likely" to meet this burden under.  On summary judgment, plaintiff must __actually__ prove success by a preponderance of the evidence.

Smelt NEPA Decision at 8-9.

C.   Applicable Legal Standards.

The general legal standards applied in the Smelt NEPA Decision also apply here:

> Because NEPA contains no separate provision for judicial review, compliance with NEPA is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A); *NW Resource Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1066 (9th Cir. 1995), provided (1) there is final agency action and (2) Plaintiffs

can show that they have suffered a legal wrong or will be adversely affected within the meaning of the statute, *Northcoast Envt'l Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998). It is undisputed that the challenged agency action, the issuance of the 2008 smelt BiOp and its RPA, is "final agency action." *See Bennet v. Spear*, 520 U.S. 154, 161, 178 (1997) (issuance of biological opinion is "final agency action"). It is also undisputed that Plaintiffs have been adversely affected by the issuance of the 2008 smelt BiOp and implementation of its RPA controlling the Projects' water flows.

NEPA requires all federal agencies to prepare an EIS to evaluate the potential environmental consequences of any proposed "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The preparation of an EIS serves a number of purposes:

It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast. Moreover, the strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies to respond to the needs of environmental quality. 115 Cong. Rec. 40425 (1969) (remarks of Sen. Muskie).

Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public

7

comment.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (internal citations and quotations omitted). "NEPA does not contain substantive requirements that dictate a particular result; instead, NEPA is aimed at ensuring agencies make informed decisions and contemplate the environmental impacts of their actions." *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 971 (D. Hi. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)). "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Ctr. for Biological Diversity v. U.S. Forest Service*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal citation and quotations omitted).

Federal regulations implementing NEPA define major federal action:

Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly ([40 C.F.R.] § 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such

funds. Actions do not include bringing judicial
or administrative civil or criminal enforcement
actions.

(b) Federal actions tend to fall within one of
the following categories:

(1) Adoption of official policy, such as
rules, regulations, and interpretations
adopted pursuant to the Administrative
Procedure Act, 5 U.S.C. 551 et seq.;
treaties and international conventions or
agreements; formal documents establishing an
agency's policies which will result in or
substantially alter agency programs.

(2) Adoption of formal plans, such as
official documents prepared or approved by
federal agencies which guide or prescribe
alternative uses of Federal resources, upon
which future agency actions will be based.

(3) Adoption of programs, such as a group of
concerted actions to implement a specific
policy or plan; systematic and connected
agency decisions allocating agency resources
to implement a specific statutory program or
executive directive.

(4) Approval of specific projects, such as
construction or management activities
located in a defined geographic area.
Projects include actions approved by permit
or other regulatory decision as well as
federal and federally assisted activities.

40 C.F.R. § 1508.18.

When an agency takes major federal, the agency must
prepare an EIS "where there are substantial questions
about whether a project may cause significant
degradation of the human environment." *Native
Ecosystems*, 428 F.3d at 1239.  An agency may choose
to prepare an environmental assessment ("EA") to
determine whether an EIS is needed.  40 C.F.R. §§
1501.4, 1508.9(b).  The EA must identify all
reasonably foreseeable impacts, analyze their
significance, and address alternatives.  40 C.F.R. §§

1508.8, 1508.9, 1508.27.  If, based on the EA, the agency concludes that the proposed actions will not significantly affect the environment, it may issue a Finding of No Significant Impact ("FONSI") and forego completion of an EIS.  *See Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988); 40 C.F.R. § 1501.4(e).

Whether an action may significantly affect the environment "requires consideration of context and intensity."  *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)(citing 40 C.F.R. § 1508.27). "Context delimits the scope of the agency's action, including the interests affected."  *Id*. (quoting *Nat'l. Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 731 (9th Cir. 2001)).

> Intensity refers to the "severity of impact," which includes both beneficial and adverse impacts, [t]he degree to which the proposed action affects public health or safety, [t]he degree to which the effects on the quality of the human environment are likely to be highly controversial, "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."

*Id*. at 1185-86 (citing 40 C.F.R. § 1508.27(b)(2), (4), (5), (7)).

The parties debate at length the degree of deference owed to an agency's decision under NEPA.  However, in this case, neither agency made any NEPA-related decision to which deference is owed.  The relevant standard is "reasonableness," as articulated in *High Sierra Hikers Ass'n v. Blackwell*:

> Typically, an agency's decision not to prepare an EIS is reviewed under the arbitrary and capricious standard; however, where an agency has decided that a project does not require an EIS without first conducting an EA, we review under the reasonableness standard.

10

390 F.3d 630, 640 (9th Cir. 2004). "Further, when an agency has taken action without observance of the procedure required by law, that action will be set aside." *Id.* (citations omitted).

Smelt NEPA Decision at 9-14.

D.   Major Federal Action.

40 C.F.R. § 1508.18 provides that major[5] "[f]ederal actions tend to fall within one of the following categories":

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18. Plaintiffs principally rely on § 1508.18(b)(4) as a basis for imposing NEPA obligations on NMFS in this case, arguing that the 2009 Salmonid BiOp is an "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area."

_____

[5] Section 1508.18 provides that the word "major" in the phrase major federal action "reinforces but does not have a meaning independent of" the term "significantly" in "significantly affecting the human environment."

Doc. 83 at 11.   Under this provision, "Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities."   § 1508.18(b)(4).

    1.   ***Ramsey v. Kantor* is Distinguishable.**

    ***Ramsey v. Kantor***, 96 F.3d 434 (9th Cir. 1996), is the only decision to have applied 40 C.F.R. § 1508.18(b)(4) to require NEPA analysis for a biological opinion.   The Smelt NEPA Decision distinguished *Ramsey*:

> ...***Ramsey v. Kantor***, 96 F.3d 434 (9th Cir. 1996), [] applied NEPA to the National Marine Fisheries Service's ("NMFS") issuance of a biological opinion and incidental take statement ("ITS") under ESA § 7 permitting state regulators to issue salmon fishing regulations consistent with that take statement.   96 F.3d at 441-445.   *Ramsey* found the biological opinion and ITS constituted "major federal action," triggering NEPA compliance, because it was "clear ... both from our cases and from the federal regulations, *see* 40 C.F.R. § 1508.18, that if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must conduct an EA and possibly an EIS before granting it."   *Id.* at 444.
>
> *Ramsey* determined:
>
> > [T]he incidental take statement in this case is functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement.   Accordingly, we hold that the issuance of that statement constitutes major federal action for purposes of NEPA.
>
> *Id.*
>
> The *Ramsey* federal defendants contended that there was insufficient federal participation in a state run

12

project to require an EIS.  The Appeals Court
disagreed:  "if a federal permit is a prerequisite
for a project with adverse impact on the environment,
issuance of that permit does constitute a major
federal action...." triggering NEPA.  *Id.* at 444
(internal citations and quotations omitted).  *Ramsey*
held that "the incidental take statement in [that]
case is functionally equivalent to a permit because
the activity in question would, for all practical
purposes, be prohibited but for the incidental take
statement."  *Id.*  Because the ITS was the functional
equivalent of a permit, NEPA applied to the issuance
of the biological opinion, despite federal
defendants' contention that the mere issuance of an
ITS was insufficient federal participation in a state
project.

Here, unlike *Ramsey*, the CVP is an entirely federal
project, operated by Reclamation, a federal agency,
rendering Ramsey's "functional equivalency" analysis
largely irrelevant.  <u>*Ramsey* stands for two important
principles:  First, under certain circumstances, a
biological opinion may qualify as a major federal
action for NEPA purposes; second, not every
biological opinion is a major federal action</u>.

Smelt NEPA Decision at 16-17 (footnotes omitted)(emphasis

added).

     Here, in an argument that would have been equally

applicable in the smelt case, but was not raised there,

Plaintiffs suggest that the Smelt NEPA Decision incorrectly

concluded that *Ramsey* is distinguishable because the BiOp

applies not only to operations of the federal CVP, but also to

operations of the SWP, a state-run project.  Plaintiffs

maintain "Reclamation should not have to account for the

environmental effects of a biological opinion it did not

produce on a water supply project it does not operate."  Doc.

106 at 11.

But, Plaintiffs ignore the interconnected nature of the SWP and CVP projects.  Reclamation and DWR have, for many years, operated the projects in a coordinated manner.  *See* OCAP Biologcal Assessment ("OCAP BA") at 1-2.  The Biological Assessment ("BA"), prepared by <u>Reclamation</u>, describes the project for which consultation was being sought as "the ongoing operations of the CVP and SWP and potential future actions that are foreseeable to occur within the period covered by the project description."  *Id*. at 1-1.  The two water projects, which are jointly operated by Reclamation and DWR, share water resources, storage, pumping, and conveyance facilities to manage and deliver one third of the water supply for the State of California.  Reclamation's BA provided NMFS with extensive analyses of the effects of coordinated operation of the CVP and SWP on the Listed Species.

For the reasons described below, it is the coordinated <u>operation</u> of the projects, rather than the proposed modification of operations offered by the BiOp, that triggers NEPA.  Moreover, although it is ultimately up to the agencies involved to determine the appropriate lead agency, Reclamation, as the federal project operator, with extensive experience evaluating the environmental impacts of water deliveries, is the more appropriate agency to bear the NEPA

burden in this case.  To the extent Reclamation lacks

expertise concerning any unique environmental impacts

resulting from reduced SWP water deliveries, DWR can

participate in various ways in the preparation of NEPA

documents.  *See, e.g.*, 40 C.F.R. § 1501.5(b) (permitting state

agency to act as co-lead agency).

      2.    <u>Coordinated Project Operations is the Proper Focus of any NEPA Evaluation.</u>

Having concluded that *Ramsey* stands for the dual

proposition that while "under certain circumstances, a

biological opinion may qualify as a major federal action for

NEPA purposes ... not every biological opinion is a major

federal action," the Smelt NEPA Decision recognized that a key

factor in deciding if a BiOp is major federal action is

whether the BiOp is binding upon the action agency, citing

*Westlands Water Dist. v. U.S. Dept. of Interior, Bureau of*

*Reclamation*, 850 F. Supp. 1388, 1422 (E.D. Cal. 1994).  The

Smelt NEPA Decision found that, while both agencies bear some

responsibility for imposing the RPAs on the Projects,

Reclamation's <u>implementation</u> of the BiOp in the context of

coordinated Project operations is the more appropriate focus

of the NEPA inquiry:

> Here, to satisfy its obligations under NEPA,
> Reclamation initiated formal consultation and
> prepared a BA to describe the proposed action.  FWS,
> as the consulting agency, reviewed the BA, disagreed
> with its conclusion, and issued the 2008 BiOp with an

RPA.  *See* BiOp i-vi.  Reclamation was free to accept or reject, in whole or in part, FWS's recommendations and advice prescribed in that RPA.  The consultation regulations state that "the Federal [action] agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion."  50 C.F.R. § 402.15(a).[FN 7]  However, FWS could not issue the BiOp without also including an RPA to mitigate jeopardy.  FWS proposed an RPA that called for actions that commit federal water to smelt protection.  Reclamation was not "bound" to accept the proposed RPA, but it did so.  Resulting operations reduced 2008-09 water deliveries by several hundred thousand acre-feet.  In this case, actions speak louder than words.

[FN 7: Courts have consistently held that the action agency retains the ultimate responsibility for deciding whether, and how, to proceed with the proposed action after Section 7 consultation.  *See, e.g., Pyramid Lake Paiute Tribe of Indians v. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990); *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988) ("[the action] agency is not required to adopt the alternatives suggested in the biological opinion"); *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) ("The ESA does not give the FWS the power to order other agencies to comply with its requests or to veto their decisions."); *Westlands*, 850 F. Supp. at 1422 ("Biological opinions are not binding on the Secretary"); *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 (5th Cir. 1976)("Section 7 does not give [the Service] a veto over the actions of other federal agencies").]

Plaintiffs argue that [] FWS's issuance of the 2008 BiOp requires that <u>FWS</u> prepare an EIS, because a BiOp has a "powerful coercive effect" on the action agency.  Doc. 245-2 at 12.  On the one hand, if Reclamation had disregarded the RPA, the 2008 BiOp would not have provided an exemption from the ESA's take prohibitions, potentially subjecting the operators to civil and criminal liability.  16 U.S.C. §§ 1538(a) (prohibiting the "take" of listed species); 1536(o)(2) (a taking in compliance with a

16

biological opinion's ITS "shall not be considered to be a prohibited taking of the species concerned").[FN 8] However, Federal Defendants argue Reclamation's departure from the RPA would not necessarily violate Section 7 of the ESA, if Reclamation took "alternative, reasonably adequate steps to insure the continued existence" of listed species. *Tribal Village of Akutan*, 869 F.2d at 1193. This is sophistry. Reclamation operated the joint Projects and managed federal resources (CVP water) in accordance with the RPA, resulting in a major revision of 2008-09 coordinated CVP operations and substantial reallocation of federal resources. The only reason Reclamation did so was to meet the mandate of the ESA and the BiOp. <u>Both</u> agencies participated to some degree in the agency action at issue here.

Smelt NEPA Decision at 23-25 (footnote omitted).

Although <u>both</u> agencies participated in imposing restrictions on project operations, the district court ultimately concluded that the <u>only</u> NEPA triggering action in the smelt case was the <u>operation</u> of the projects, not the issuance of the BiOp, which was required by law as a consequence of the effects of the coordinated projects' operations.

The appropriate focus is "Project operations," and Reclamation is the appropriate lead agency. Reclamation proposed the action (in the form of the Operations and Criteria Plan ("OCAP")) to FWS, which triggered the preparation of the BiOp. Reclamation has the ongoing statutory authority to implement project operations as prescribed by the OCAP. *See, e.g.*, AR at 10262 (BA at 1-1) ("The Bureau of Reclamation (Reclamation) and the California Department of Water Resources (DWR) propose to operate the Central Valley Project (CVP) and State Water Project (SWP) to divert, store, and convey CVP and SWP (Project) water consistent with applicable law and contractual obligations."); AR at 10263-64

17

1

2

3

4

5

6

7
(BA at 1-2 - 1-3) (identifying certain laws authorizing Bureau operation of CVP); AR at 10270-71 (BA at 1-9 - 1-10) (Coordinated Operation Agreement ("COA") and P.L. 99-546 impose a "Congressional mandate to Reclamation to operate the CVP in conjunction with the SWP. FWS's involvement with regard to future Project operations is limited, consisting primarily of its obligation to ensure that those operations do not impair protection and recovery of threatened and endangered species, an obligation that it shares with Reclamation. 16 U.S.C. § 1536(a)(2).").

8

9
*Id.* at 27-28.[6]  The smelt NEPA decision concluded:

10

11

12

13

14

15

16

17

18

19

20
In the final analysis, FWS was asked for its "opinion" whether Reclamation's operations plans would jeopardize the smelt. FWS provided that opinion, as required by law. Reclamation was not "bound" by the BiOp until it chose to proceed with the OCAP and implement the RPA. Once Reclamation did so, operation of the Projects became the relevant agency "action," and Reclamation, as action agency, is the more appropriate lead agency under NEPA. The adaptive management protocol prescribed in the RPA leaves FWS with the final word on exactly what flow requirements will be imposed. Reclamation accepted this arrangement as a constraint upon its operations when it provisionally accepted the RPA. FWS played a key role in formulation, planning, and implementation of the RPA, with full knowledge that no NEPA compliance had been undertaken. This is not a shell game in which the agencies may leave the public to guess which agency has taken major federal action.

21

22

23

24

25

26

27

28
[6] The Smelt NEPA Decision also found that Reclamation "has greater expertise concerning the alleged adverse environmental effects," and "routinely examines these and related impacts as the lead or co-lead agency on NEPA reviews of proposed CVP-SWP operations and frequently has the ability and authority to propose ways to mitigate these impacts," while "FWS has little to no expertise in or authority over many of these matters." *Id.* at 28-30. Ultimately, as Federal Defendants argue in their supplemental brief, Doc. 222, the allocation of NEPA responsibilities is left to the agencies involved in the first instance. *See Hells Canyon Preservation Council v. Jacoby*, 9 F. Supp. 2d 1216, 1241 (D. Or. 1998)(concluding that "[t]he designation of a lead agency ... is a matter committed to agency discretion and ... [there is] nothing in NEPA or the regulations suggesting that the courts may overrule the determination by the agencies that are involved that one or more of them will be lead agency or agencies.").

18

> It is a close call whether FWS's <u>issuance</u> of the BiOp and its RPA under these circumstances is major federal action under NEPA.  This call need not be made, because Reclamation, the agency with the ultimate authority to implement the RPA, is ... joined as a party, whose actions must be evaluated under NEPA.

*Id.* at 31 (emphasis in original).

Had there been no other NEPA-triggering action before the court, it is a close call whether or not the issuance of the 2008 Smelt BiOp itself would have triggered NEPA under *Ramsey*, which in effect operates as a last resort mechanism when federal action upon a project would not otherwise require NEPA compliance.  However, because Reclamation is subject to the jurisdiction of the court and Reclamation's operation of the projects to allocate substantial federal water resources under a coordinated operations plan constitutes major federal action, it was unnecessary to apply *Ramsey* to find that the issuance of the 2008 Smelt BiOp triggered NEPA.

A similar conclusion is warranted here.  Reclamation's operation of the projects to comply with the 2009 Salmonid BiOp RPAs is major federal action under NEPA.  Although <u>both agencies</u> participated to some degree in imposing the RPAs upon project operations, the agencies, not the court, are charged with allocating NEPA responsibilities.  The court is simply required to evaluate whether particular actions are "major federal actions significantly affecting the human environment"

under NEPA.  Here, the operation of the projects (i.e. the implementation of the RPAs as part of overall project operations), not the issuance of the BiOp, constitutes major federal action.[7]  *Ramsey's* unique circumstances are not present here.

Plaintiffs' arguments that the 2009 Salmonid BiOp justifies a different result are unpersuasive.  Among other things, Plaintiffs emphasize that NMFS plays a continuing role in implementation of the 2009 Salmonid BiOp as a member of the Water Operations Management Team ("WOMT"), jointly (along with Reclamation) deciding whether actions recommended by technical staff are consistent with the RPA, and making "final determinations" that proposed operational actions are consistent with ESA obligations.  For example, under specified conditions, Reclamation must consult monthly with NMFS regarding Keswick releases and submit a projected forecast to NMFS, which NMFS must review and provide recommendations to Reclamation.  2009 Salmonid BiOp at 598.  Reclamation may seek relaxation of release restrictions to meet other legal requirements "with NMFS' concurrence."  2009 Salmonid BiOp at

---

[7] This conclusion is consistent with NMFS's Consultation Handbook, which explains that NMFS's role is to assist the federal "action agency" in evaluating the impacts of proposed actions on the environment and "integrating the formal consultation process into [the action agency's] overall environmental compliance."  FWS & NMFS Consultation Handbook at 4-11.  Judicial Notice has previously been taken of this document in the related Consolidated Delta Smelt Cases.  *See San Luis & Delta-Mendota Water Authority v. Salazar*, --- F. Supp. 2d ---, 2009 WL 3428487, *3 (E.D. Cal. Oct. 15, 2009), available at:
http://www.nmfs.noaa.gov/pr/pdfs/laws/esa_section7_handbook.pdf.

599.

This is no different than the 2008 Smelt BiOp, where the adaptive management protocol prescribed in the RPA leaves FWS with the final word on exactly what flow requirements will be imposed.  Here, as with the 2008 Smelt BiOp, "Reclamation accepted this arrangement as a constraint upon <u>its operations</u> when it provisionally accepted the RPA."  Similarly, NMFS played a key role in formulating, planning, and implementing the RPA.  But, this does not change the fact that it is the operation of the projects by Reclamation, not the issuance of the BiOp that triggers NEPA.  It may well be that Reclamation as action agency must look to NMFS as the expert consulting agency for expertise, guidance, and analysis in achieving NEPA compliance to the extent such knowledge and acumen is unavailable within Reclamation.

Plaintiffs' half-hearted invocation of 40 C.F.R. § 1508.18(b)(2) is unpersuasive.  Section 1508.18(b)(2) defines as major federal action "formal plans ... which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based."  Plaintiffs suggest that NMFS's issuance of the BiOp triggers this provision because the BiOp "tells the CVP/SWP operators how, when, and in what quantities to use their resources to avoid jeopardizing species listed under the [ESA]."  Doc. 115 at 3.  Again, until

Reclamation determined that it would provisionally accept the RPA's, the BiOp was not binding upon Reclamation.   NMFS had no way of knowing whether its recommendations (in the form of RPAs) would be accepted, accepted in part, or rejected outright.   The BiOp did not "guide" or "prescribe" anything until it was provisionally accepted.   After Reclamation provisionally committed to implement the RPAs, they became binding and effective.   No party has suggested that NMFS has the expertise or ability to <u>implement</u> the RPAs on its own.   It would be futile to require NMFS to prepare NEPA documentation on a set of actions that the action agency is free to disregard or substantially modify.   The major federal action here is <u>implementation</u> of the RPAs as a part of coordinated project operations.   Because of the nature of the adaptive management process, both NMFS and the Bureau exert some control over the implementation process.   It is up to the agencies to determine how to allocate NEPA responsibilities among themselves and any other federal or state agencies.

Plaintiffs' reference in their supplemental brief, Doc. 225, to Appendix A, Section 4.01m of NOAA's NEPA Guidelines is unpersuasive.   Section 4.01m defines "major federal action,"

> An activity, such as a plan, project or program, which may be fully or partially funded, regulated, conducted, or approved by a Federal agency. "Major" reinforces, but does not have a meaning independent of "significantly" as defined in Section 4.01.x. and 6.01. of this Order. Major actions require

preparation of an EA or EIS unless covered by a CE (40 CFR 1508.18). CEQ's definition of "scope" regarding the type of actions, the alternatives considered, and the impacts of the action should be used to assist determinations of the type of document (EA or EIS) needed for NEPA compliance (40 CFR 1508.25).

Plaintiffs suggest that NMFS's issuance of the 2009 Salmonid BiOp falls squarely within this definition of "major federal action" because "NMFS is indisputably <u>regulating</u> the operations of the [CVP] and [SWP]," and "[u]nder the BiOp NMFS will <u>conduct</u> adaptive management, [by making] regular and ongoing decisions determining how the projects operate." Doc. 225 at 2-3 (emphasis added). Plaintiffs overlook the central focus of section 4.01m, that major federal action is an "activity, such as a plan, project or program." Here, the activity is <u>the operation of the projects</u>. NMFS, as consultant, does regulate that activity, and participates in controlling conducting project operations under the adaptive management protocol set forth in the RPA along with Reclamation, the project operator, but this does not transform the issuance of the BiOp itself into a NEPA triggering action.[8]

Finally, Plaintiffs cite *Anacostia Watershed Soc. v. Babbitt*, 871 F. Supp. 475, 482 (D.D.C. 1994), which addresses

---

[8]   In *Ramsey*, the activity was not conducted by a federal agency, so the regulation itself (the biological opinion) constituted major federal action. Here, however, where operation of the projects is primarily the responsibility of Reclamation, along with DWR, *Ramsey* is distinguishable.

23

whether an agency may rely on the NEPA compliance of another agency to justify its own non-compliance.  In *Anacostia*, the National Park Service ("NPS"), without performing any NEPA analysis of its own, transferred jurisdiction over portions of a National Park to the District of Columbia for development of a theme park.  NPS argued that its own NEPA obligations were satisfied by past and future NEPA compliance by a federal planning commission charged with approving development concepts within the District of Columbia.  The district court rejected this contention, concluding that NPS must take its own hard look at the environmental impacts.  *Id*. at 484.

Critically, in *Anacostia*, it was undisputed that the development project constituted major federal action. *Anacostia* therefore sheds no light on whether the issuance of the 2009 Salmonid BiOp, standing alone, constitutes major federal action.  *Anacostia* merely explains that, once a major federal action is identified, all agencies participating in that action bear NEPA responsibilities that cannot be absolved simply because another agency has engaged in the NEPA process. Likewise, because NMFS plays an integral role in formulating and requiring implementation of the RPAs as part of overall project operations, NMFS is not be absolved of responsibility under NEPA even if Reclamation completed a NEPA review on its own.  However, *Anacostia* does not suggest that NMFS had to be

the lead agency in order to satisfy its own NEPA obligations, given that NMFS could participate in the NEPA process as a joint lead agency or consulting agency.[9]

It is the implementation of the RPAs, as part of overall project operations, not the issuance of the BiOp, that is the "major federal action" in this case.  Both Reclamation and NMFS participate in implementing the RPAs.  Under NEPA, it is up to both agencies to allocate their NEPA compliance responsibilities on remand.[10]

   3.   **Implementation of the BiOp and its RPA Effect a
        Significant Change to the Operational Status Quo.**

Based on the determination that it is Reclamation's implementation of the BiOp and its RPA, not the issuance of the BiOp, that is the proper focus of any NEPA inquiry, does Reclamation's implementation trigger NEPA obligations?  The relevant standards are described in the Smelt NEPA Decision:

      Projects such as the CVP and SWP, constructed prior

_____

[9]Plaintiffs also rely on *Idaho v. ICC*, 35 F. 3d 585 (D.C. Cir. 1994), which rejected the ICC's contention that it need not comply with NEPA because it required a private applicant to consult with various federal and state agencies about specific environmental impacts and retained jurisdiction to monitor compliance with the consultation requirements, holding that "[a]n agency cannot delegate its NEPA responsibilities in this manner...."  Here, where no NEPA compliance has been performed at all, NMFS has yet to attempt to delegate its own NEPA responsibilities vis-à-vis project operations to another agency.

[10] This is not an endorsement of Defendant Intervenors' argument the district court lacks authority to enjoin operation of aspects of the RPAs because NMFS's issuance of the BiOp itself has not been found unlawful. Defendant Intervenors want to have their cake and eat it too.  If, as they insist, Reclamation has the final word on implementation of the BiOp, Reclamation's failure to comply with NEPA empowers this Court to issue appropriate injunctive relief against any party acting in concert with Reclamation, so long as such injunctive relief does not violate the ESA.

to the date on which NEPA became effective, January 1, 1970, are not retroactively subject to NEPA.  *See Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990).  "However, if an ongoing project undergoes changes which themselves amount to major Federal actions, the operating agency must prepare an EIS."  *Id*. at 234-35 (citing *Andrus v. Sierra Club*, 442 U.S. 347, 363 n. 21 (1979)(explaining that major federal actions include the "expansion or revision of ongoing programs")).  The critical inquiry is whether the BiOp causes a change to the operational status quo of an existing project.  *Upper Snake River*, 921 F.2d at 235.

*Upper Snake River* concerned Reclamation's decision to reduce flows below Palisades Dam and Reservoir to below 1,000 cfs "[d]ue to lack of precipitation ... to increase water stored for irrigation...."  921 F.2d at 234.  Although it had been standard operating procedure since 1956 to maintain flows below that dam above 1,000 cfs, during previous dry periods, the average flow had "been lower than 1,000 cfs for 555 days (or 4.75% of the total days in operation)."  *Id*. at 233.  Because the challenged flow fluctuations were within historic operational patterns, no NEPA compliance was required:

> The Federal defendants in this case had been operating the dam for upwards of ten years before the effective date of the Act. During that period, they have from time to time and depending on the river's flow level, adjusted up or down the volume of water released from the Dam. <u>What they did in prior years and what they were doing during the period under consideration were no more than the routine managerial actions regularly carried on from the outset without change</u>. They are simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational. Its operation is and has been carried on and the consequences have been no different than those in years past.

> The plaintiffs point out that flow rates have been significantly below 1,000 cfs for periods of seven days or more only in water years 1977, 1982, and 1988, all years of major drought. They also note that prior to construction of the dam,

the lowest recorded flow rate did not fall below 1400 cfs. From these facts, they argue that the Bureau's reduction of the flow below 1,000 cfs is not a routine managerial action. However, a particular flow rate will vary over time as changing weather conditions dictate. In particular, low flows are the routine during drought years. What does not change is the Bureau's monitoring and control of the flow rate to ensure that the most practicable conservation of water is achieved in the Minidoka Irrigation Project. Such activity by the Bureau is routine.

*Id.* at 235-36 (emphasis added).

*Westlands* specifically distinguished *Upper Snake River*, and reasoned that whether or not an EIS was required "will, of necessity, depend heavily upon the unique factual circumstances of each case." 850 F. Supp. at 1415 (citing *Westside Property Owners v. Schlesinger*, 597 F.2d 1214, 1224 (9th Cir. 1979)).

To some extent, the finding is based on whether the proposed agency action and its environmental effects were within the contemplation of the original project when adopted or approved. *See* [*Port of Astoria, Or. v. Hodel*, 595 F.2d 467, 476 (9th Cir. 1979)]; *Robinswood Community Club [v. Volpe]*, 506 F.2d 1366 [(9th Cir. 1974)]. The inquiry requires a determination of whether plaintiffs have complained of actions which may cause significant degradation of the human environment. [*City and County of San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980)].

*Westlands*, 850 F. Supp. at 1415 [(emphasis added)]. In *Westlands* "the taking of water for non-agricultural purposes [was] alleged to have changed the operational requirements of the CVP, imposed new standards for reverse flows in the Western Delta, carryover storage in the Shasta reservoir, and caused closure of the Delta cross-channel. Such actions and the environmental effects alleged are not routine managerial changes." *Id*. at 1421.

Smelt NEPA Decision at 33-35.  This approach was utilized in the smelt case as follows:

27

Federal Defendants present the Declaration of Paul Fujitani, Doc. 290-2, which includes a review of historic OMR flows and compares those flows to projected flows under the RPA.  Based on Fujitani's declaration, Federal Defendants argue:

> As the available historical data show ... average OMR flows in January have fluctuated from as high as -3,269 cfs (January 1998) to as low as -8,268 cfs (January 2003).  Daily flows vary even more widely -- for example, in January 1998, daily OMR flows ranged between 2,810 cfs and -9,530 cfs. *See* Ex. 1.  The flows set forth in RPA Component 1, Action 2 are within these historic parameters. Similarly, the historical record shows average OMR flows in February have fluctuated from as high as 20,631 cfs (February 1997) to as low as -9,086 cfs (February 2003).  The February flows set forth in RPA Component 1, Action 2 are also within these historic parameters.
>
> RPA Component 2 provides that under certain conditions, OMR flows should be maintained between -1,250 and -5,000 cfs from the date Component 1 is completed until June 30 (or until water temperatures at Clifton Court Forebay reach 25 degrees Celsius).  The available historic data shows a wide range of OMR flows between January and July, and the flow ranges set forth in RPA Component 2 are within these historic parameters. *See* Ex. 1.
>
> Therefore, even after adopting the OMR flow restrictions, Reclamation continues to operate the CVP within existing law and the same overall flow parameters, as it has done for decades.

*Id.* at 22-23.

Plaintiffs respond with the declaration of Thomas Boardman, Doc. 297-2, who opines that, under certain scenarios, the RPA constrains export pumping in a manner that departs from the status quo ante:

> I reviewed historic data and considered how the 2008 BiOp might affect operations as compared to the pre-existing criteria in D-1641.  Based upon my review of those data, I found, in some circumstances, operating the CVP and SWP to meet pre-existing D-1641 criteria resulted in OMR flows more positive than -1,250 cfs.  If those circumstances occur, the new OMR criteria in the

2008 BiOp would not control.  I also found, in
some circumstances, operating the CVP and SWP to
meet the pre-existing D-1641 criteria resulted in
OMR flows within the range specified by FWS
pursuant to the 2008 BiOp.  If those
circumstances are presented again, the 2008 BiOp
may control CVP and SWP operations, depending
upon where in the range FWS sets the OMR limit.
In still other circumstances, however, I found
the pre-existing D-1641 criteria allowed OMR
flows more negative than -5,000 cfs, the most
negative flow rate allowed under the 2008 BiOp.
If those circumstances occur, the new operating
criteria in the 2008 BiOp will definitely control
CVP and SWP operations.  The changes in CVP and
SWP operations necessary to meet the new
operating criteria in the 2008 BiOp will reduce
availability of the CVP and SWP to supply water.

*Id.* at ¶9.

Boardman also concluded that "[i]n 2009, limits on
OMR flows imposed by FWS under the 2008 BiOp resulted
in lower rates of CVP and SWP pumping than otherwise
would have been allowed if only the preexisting
criteria in D-1641 controlled."  *Id.* at ¶10.
Boardman estimates "that as a result of the 2008 BiOp
limits on OMR flows from mid February to the end of
March and from mid May to the end of June, the Jones
Pumping Plant was unable to pump approximately
390,000 acre-feet of water that it otherwise could
have pumped and provided to water users south of the
Delta, if only the pre-existing criteria in D-1641
controlled."  *Id.*

Fujitani's and Boardman's conclusions are not
inconsistent.  Fujitani concludes that average and
daily OMR flows under the RPA fall within historic
average and daily flow ranges.  Boardman opines that,
even though any given post-RPA average or daily OMR
flow figure may fall within historic ranges, under
certain circumstances, pre-RPA constraints would
permit even more negative flows, resulting in even
more export capability.  Although Fujitani's
conclusion, that post-RPA operations fall within the
range of historic operating conditions, may comply
with the letter of *Upper Snake River*, the RPA's
operational changes violate the spirit and reasoning

29

of *Upper Snake River*:

> This circuit has held that where a proposed federal action would not change the status quo, an EIS is not necessary. "An EIS need not discuss the environmental effects of mere continued operation of a facility." *Burbank Anti-Noise Group v. Goldschmidt,* 623 F.2d 115, 116 (9th Cir. 1980) (holding EIS unnecessary for federal financial assistance in purchasing an existing airport since federal action would not change status quo), cert. denied, 450 U.S. 965 (1981); *see also Committee for Auto Responsibility v. Solomon*, 603 F.2d 992 (D.C. Cir. 1979) (holding government lease of parking area to new parking management firm does not trigger EIS requirement since area already used for parking so no change in status quo).

> We find the reasoning of the district court in County of *Trinity v. Andrus* particularly instructive. In *Trinity* the plaintiffs sought to enjoin the Bureau from lowering the level of a reservoir during the drought year of 1977 because of the potential damage to the fish population in the reservoir. The court explained that the issue was "not whether the actions are of sufficient magnitude to require the preparation of an EIS, but rather whether NEPA was intended to apply at all to the continuing operations of completed facilities."  *Id.* at 1388. The court distinguished the case from cases "when a project takes place in incremental stages of major proportions," and from cases where "a revision or expansion of the original facilities is contemplated," *id*. Neither of these situations applied here, the court observed. Instead,

>> [t]he Bureau has neither enlarged its capacity to divert water from the Trinity River nor revised its procedures or standards for releases into the Trinity River and the drawdown of reservoirs. It is simply operating the Division within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions.

*Id*. at 1388-89. The court then concluded that actions taken in operating the system of dams and reservoirs (in particular, operational responses in a drought year) were not "major Federal actions" within the meaning of NEPA.

The Federal defendants in this case had been operating the dam for upwards of ten years before the effective date of the Act. During that period, they have from time to time and depending on the river's flow level, adjusted up or down the volume of water released from the Dam. What they did in prior years and what they were doing during the period under consideration were no more than the routine managerial actions regularly carried on from the outset without change. They are simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational. Its operation is and has been carried on and the consequences have been no different than those in years past.

The plaintiffs point out that flow rates have been significantly below 1,000 cfs for periods of seven days or more only in water years 1977, 1982, and 1988, all years of major drought. They also note that prior to construction of the dam, the lowest recorded flow rate did not fall below 1400 cfs. From these facts, they argue that the Bureau's reduction of the flow below 1,000 cfs is not a routine managerial action. However, a particular flow rate will vary over time as changing weather conditions dictate. In particular, low flows are the routine during drought years. What does not change is the Bureau's monitoring and control of the flow rate to ensure that the most practicable conservation of water is achieved in the Minidoka Irrigation Project. Such activity by the Bureau is routine.

921 F.2d at 235-36 (emphasis added).

Here, in contrast to the "routine" activities described in *Upper Snake River* and *Trinity* (cited in *Upper Snake River*), Reclamation's decision to implement the RPA is a "revis[ion] [of] its

31

<u>procedures or standards" for operating the Jones pumping plant and other facilities significantly affecting OMR flows</u>.  This can be determined from the face of the BiOp and uncontroverted analyses of public data.  Reclamation's and FWS's joint interest is pellucid:  the Projects' water delivery operations must be <u>materially changed</u> to restrict project water flows to protect the smelt.  Reclamation's implementation of the BiOp is major federal action because it substantially alters the status quo in the Projects' operations.

Smelt NEPA Decision at 37-42 (emphasis added; footnotes omitted).

Likewise, implementation of the 2009 Salmonid BiOp is not a continuation of the status quo.  Plaintiffs offer the following as specific examples of significant changes imposed by the 2009 Salmonid BiOp:

- Action IV.2.1 of the BiOp's RPA imposes an entirely new "inflow to export ratio" on the San Joaquin River's water flows.  2009 Salmonid BiOp at 641.

- Actions I.2.2 through I.2.4 establishes new Keswick Dam release requirements and restrictions.  2009 Salmonid BiOp at 592-603.

- Action IV.1.2 requires nearly year-round modification of DCC gate operations, involving gate closures during periods when DCC gate operations were previously unrestricted.  2009 Salmonid BiOp at 635-40.

- Action IV.2.3 calls for more restrictive OMR flows of -2,500 cfs to -5,000 cfs.  2009 Salmonid BiOp at 648-52.

- Three separate actions impose a substantially higher fishery flow release schedule on New Melones for the purported benefit of steelhead.

  ○ First, Action III.1.3 requires a set minimum flow schedule for the benefit of steelhead by mandating the release of between 186,000 to 589,000 acre-feet annually, depending on water year type.  2009

32

Salmonid BiOp at 622-23 and Appendix 2-E.

○ Second, Action III.1.2 requires Reclamation to release additional water (above the new flow required by Appendix 2-E), if needed, to maintain new, lower minimum temperatures at a specific location in the Stanislaus River.  2009 Salmonid BiOp at 620-21.

○ Third, Action VI.2.1 increases the minimum flow required at Vernalis on the San Joaquin River during the April-May pulse flow (VAMP) period, and directs Reclamation to make releases from Goodwin Reservoir on the Stanislaus River to meet these new flow requirements.  2009 Salmonid BiOp at 641-45.[11]

Federal Defendants do not concede that all of these Actions constitute new operational restrictions.  For example, Actions I.2.2.A and I.2.2.B merely provide that Reclamation will consult with NMFS and other agencies if the end of year storage at Shasta Reservoir reaches a certain level; they do not impose any new operational restrictions.  *See* 2009 Salmonid BiOp at 593-95.  However, Federal Defendants "acknowledge that at least Action IV.2.3, which describes OMR flows between January through June, constitutes a revised 'procedure or standard' for operations, as that term is interpreted and used in the Court's Delta Smelt Decision."  Doc. 100 at 21.

Federal Defendants insist that NEPA compliance is not

_____

[11] Plaintiffs Stockton East Water District, Oakdale Irrigation District, and South San Joaquin Irrigation District also contend that portions of the 2009 Salmonid BiOp conflict with other court orders, are poorly modeled, and are internally inconsistent.  *See* Doc. 83-3 at 17-23. These arguments are premature, as they relate to the merits of the 2009 Salmonid BiOp, not the question application of NEPA.

required because the 2009 Salmonid BiOp "does not change the purpose of the CVP, and even after its provisional acceptance, Reclamation continues to operate the CVP within existing law." Doc. 101 at 17.  But, this standard does not accurately reflect the relevant authorities.  *Upper Snake River*, 921 F.2d at 235, quoting *Trinity County*, 438 F. Supp. at 1388-89, distinguished cases in which Reclamation has "enlarged its capacity to divert water" ... "<u>revised its procedures or standards for releasing into [a river]</u> and the drawdown of reservoirs," (emphasis added), which would trigger NEPA, from those cases in which Reclamation is "simply operating [a project] within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions," which would not trigger NEPA.  Here, implementation of the RPA constitutes a non-trivial "revision of procedures or standards" for the operation of the Projects with draconian consequences.  *Upper Snake River* and *Trinity* indicate that such revisions do, in fact, trigger NEPA.  It is hard to imagine more significant adverse effects to the human environment than were effectuated by implementation of the RPAs.

Federal Defendants also argue that whether Reclamation's implementation of the complex RPA will significantly change flows can only be determined based on a review of the facts in

the administrative record, which is not yet complete.  Rather
than offer any evidence of the range of historic operating
conditions or how the implementation of the RPA differs from
that range, Plaintiffs rely entirely on NMFS's water loss
estimates in the 2009 Salmonid BiOp.  NMFS projects that the
RPA will impact water supplies by reducing water exports 5-7%,
or around 330,000 acre-feet annually on average, over and
above the effect of the restrictions imposed by the 2008 Smelt
BiOp.  2009 Salmonid BiOp at 720.  On the Stanislaus, NMFS
estimated that the RPA requirements would decrease deliveries
to OID/SSJID by three percent on average and to Stockton East
and Central by twenty-two percent on average.  2009 Salmonid
BiOp Appendix 5 at 54.

     Federal Defendants argue that these estimates are not
sufficient to establish that the RPA will significantly change
flows.  In support of this proposition, Federal Defendants
principally rely on Central Valley Project Improvement Act
("CVPIA"), section 3406(b)(2), which requires Reclamation to
"dedicate and manage annually 800,000 acre-feet of Central
Valley Project yield for the primary purpose of implementing
the fish, wildlife, and habitat restoration purposes and
measures authorized by this title...."  Pub. L. 102-575, 106
Stat. 4600, 4706 (1992).  The 2009 Salmonid BiOp notes that
"[i]f the Secretary of the Interior so chooses, dedication of

[CVPIA] b(2) water assets to the RPA actions could completely or significantly offset the projected water available, in part, to offset water costs of the RPA." 2009 Salmonid BiOp at 722. At the outset, CVPIA assets do not "offset" losses at all. At best, all losses attributable to the 2009 Salmonid BiOp might be counted toward the 800,000 AF dedication, reducing Reclamation's ability to us CVPIA assets in other ways.

More pertinently, Federal Defendants and Defendant Intervenors point out that, in 1999, Reclamation prepared a programmatic EIS ("PEIS") addressing the environmental impacts expected from implementation of the CVPIA, including the mandatory 800,000 AF dedication of water to environmental purposes. The CVPIA PEIS evaluated various environmental impacts resulting from reduced surface water supplies, including many of the harms claimed by the Plaintiffs. However, that PEIS was prepared more than ten (10) years ago. Since then, the legal environment has changed considerably. For example, the Ninth Circuit held that Reclamation is not required to count water devoted to ESA uses toward the 800,000 AF dedication, *Bay Institute of San Francisco v. United States*, 87 Fed. Appx. 637 at 639-40 (9th Cir. 2004), allowing, in some years, significantly more than the originally-intended 800,000 AF dedication to environmental purposes. The CVPIA

PEIS does not address this changed circumstance, nor does it address how reduced water deliveries might compound the already difficult present adverse economic and environmental conditions in the Central Valley of California.  At a bare minimum, reliance on the CVPIA PEIS to comply with NEPA in this case is something that should have been done explicitly by Reclamation in an EA or tiered EIS, neither of which has been undertaken.

At the very least, Action IV.2.3 (OMR Flow Restrictions) constitutes a significant revision to Reclamations' procedures or standards for operating the CVP.  This can be determined from the face of the BiOp and undisputed facts, without the need for a completed administrative record.  Under *Upper Snake River* and *Trinity*, such significant revisions trigger NEPA, provided the final element -- whether there are substantial questions about whether a project may significantly effect the human environment -- is satisfied.

E.   <u>Significantly Affect the Human Environment.</u>

If the "major federal action" component is satisfied, an agency must prepare an EIS "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council*, 428 F.3d at 1239.  In the Smelt case, Plaintiffs accurately maintained that the 2008 Smelt BiOp satisfies this

standard because it "reallocates hundreds of thousands of acre-feet of water annually -- enough water to serve the needs of millions of people -- from the current reasonable and beneficial municipal, industrial, agricultural, and other uses."  1:09-cv-00407, Doc. 245-2 at 22.

As is the case here, the administrative record was not yet fully resolved in the Smelt case and the parties agreed the NEPA summary judgment motion should be resolved without reference to the administrative record.  The Smelt NEPA Decision concluded that "certain, dispositive conclusions [could] be made without looking to the AR":

> First, it is undisputed that implementation of the RPA reduced pumping by more than 300,000 AF in the 2008-09 water year.  *See* Boardman Decl., Doc. 297-2 at ¶10.  FWS admitted in its Answer to the State Water Contractors' Complaint that such "reductions in exports from the Delta" may "place greater demands upon alternative sources of water, including groundwater."  Doc. 141 at ¶¶ 4, 16.  The potential environmental impact of groundwater overdraft is beyond reasonable dispute.  *See, e.g., NRDC v. Kempthorne*, 2008 WL 5054115, *27 (E.D. Cal. Nov. 19, 2008)(noting that the final EIS covering renewal of the Sacramento River Settlement Contracts "predicts that reversion to the pre-settlement regime would have potential effects on the environment, because the Settlement Contractors would rely more heavily on local groundwater, leading to air quality and soil erosion problems, as well as impacts to local streams and wildlife."); *NRDC v. Kempthorne*, 2007 WL 4462395 (E.D. Cal. 2007) (acknowledging "[r]isks that will be created by implementation of [] interim remedial actions" designed to protect smelt "include, but are not limited to ... Adverse effects on agriculture including, but not limited to, loss of jobs, increased groundwater pumping, fallowed land, and land subsidence[;] [and] Air pollution resulting from

heavier reliance on groundwater pumping and decrease
in surface irrigation....").   This, in and of itself,
raises the kind of "serious questions" about whether
a project may cause significant degradation of the
human environment, requiring NEPA compliance.   That
the Bureau must comply with NEPA is established as a
matter of law.

Smelt NEPA Decision at 43-44.

Here, NMFS concedes that the RPA will materially reduce

water exports by 5-7 percent, or approximately 330,000 AF.

2009 Salmonid BiOp at 720.   As with the Smelt NEPA Decision,

that such reductions have the potential to significantly

effect the human environment are beyond dispute.   The smelt

reductions have already caused such impacts.

As was recently recognized in connection with Plaintiffs'

request for emergency injunctive relief in this case

[I]t is also undisputed that any lost pumping
capacity directly attributable to the 2009 Salmonid
BiOp will contribute to and exacerbate the currently
catastrophic situation faced by Plaintiffs, whose
farms, businesses, water service areas, and impacted
cities and counties, are dependent, some exclusively,
upon CVP and/or SWP water deliveries. The impacts
overall of reduced deliveries include irretrievable
resource losses (permanent crops, fallowed lands,
destruction of family and entity farming businesses);
social disruption and dislocation; as well as
environmental harms caused by, among other things,
increased groundwater consumption and overdraft, and
possible air quality reduction.

Doc. 202 at 15-16.   This is not to say that such effects will

definitely occur.   Federal Defendants and Defendant

Intervenors may dispute the magnitude of these effects and/or

the causal connection between implementation of the 2009

Salmonid BiOp RPAs and the effects, but there can be no

dispute that "there are substantial questions" about whether coordinated operation of the CVP and SWP under the RPAs "may cause significant degradation of the human environment." *Native Ecosystems Council*, 428 F.3d at 1239.  No more is required to trigger NEPA.  It was up to the agencies to take the required "hard look."  They did not.  Once they satisfy their NEPA obligations, the course of action ultimately undertaken is entitled to deference.

F.   **Miscellaneous Issues.**

    1.   **Will Application of NEPA to the Issuance of the BiOp Frustrate the Purposes of the ESA?**

Defendant Intervenors argue here, as they did in the Smelt NEPA decision, that application of NEPA to FWS's _issuance_ of the BiOp will frustrate the purposes of the ESA.  Doc. 82 at 4-5.  As in the Smelt case, "[i]t is not necessary to address this argument because it is not necessary to decide whether NEPA applies to FWS's issuance of the BiOp.  NEPA applies to Reclamation's acceptance and implementation of the BiOp and its RPA.  This dispute over statutory priority is premature."  Smelt NEPA Decision at 44.

    2.   **The Amicus Brief.**

The Pacific Legal Foundation ("PLF") submitted a nineteen page amicus brief in support of Plaintiffs' motion for summary judgment, in which they argue that requiring "the United

States to engage in the NEPA review process furthers the statute's purpose of providing a democratic check on significant federal actions that harm the human environment." Doc. 84.  PLF's extensive policy arguments are unnecessary, where the plain language of the law imposes an obligation upon the United States Bureau of Reclamation to comply with NEPA. *Northern States Power Co. v. United States*, 89 F.3d 1350, 1355 (8th Cir. 1996)(Where the intent of Congress is clear from the plain language of the statutory provision, "legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative.").  While the amicus brief has been fully considered, it need not be discussed further.

G.   Remedies.

     Plaintiffs address remedies issues in their motion for summary judgment.  As a starting point, an injunction should not issue where "enjoining government action allegedly in violation of NEPA might actually jeopardize natural resources."  *Save Our Ecosystems*, 747 F.2d 1240, 1250 n.16 (9th Cir. 1984).  The interplay between the NEPA violation and jeopardy is a complex one that has not yet been properly briefed.  More to the point, preliminary injunction proceedings are set for hearing on a firm schedule for late March and early April of this year.  No more is required at

41

this juncture.

### III. <u>CONCLUSION</u>

For all the reasons stated above, Plaintiffs' are entitled to summary judgment on their claim against Federal Defendants that Reclamation's provisional adoption and NMFS and Reclamation's implementation of the 2009 Salmonid BiOp and its RPA without preparing any NEPA documentation violated NEPA.

Plaintiffs shall submit a form of order consistent with this memorandum decision within ten (10) days of electronic service.

SO ORDERED
Dated:  March 5, 2010

<u>/s/ Oliver W. Wanger</u>
Oliver W. Wanger
United States District Judge

42