UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| The Consolidated Salmonid Cases | 1:09-cv-1053 OWW DLB<br>1:09-cv-1090-OWW-DLB<br>1:09-cv-1378-OWW-DLB<br>1:09-cv-1520-OWW-DLB<br>1:09-cv-1580-OWW-DLB<br>1:09-cv-1625-OWW-SMS |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.* v. GARY F. LOCKE, *et al.* | |
| STOCKTON EAST WATER DISTRICT v. NOAA, *et al.* | SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION (SUPPLEMENTING DOC. 347) |
| STATE WATER CONTRACTORS v. GARY F. LOCKE, *et al.* | |
| KERN COUNTY WATER AGENCY, *et al.* v. U.S. DEPARTMENT OF COMMERCE, *et al.* | |
| OAKDALE IRRIGATION DISTRICT, *et al.* v. U.S. DEPARTMENT OF COMMERCE, et al. | |
| METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA v. NMFS, *et al.* | |

I. <u>INTRODUCTION</u>

On May 18, 2010, the Court issued findings of fact and conclusions of law concerning motions for interim relief/ preliminary injunction.  Findings of Fact and Conclusions of Law re: Plaintiffs' Request for Preliminary Injunction (Docs. 161 & 230), Doc. 347 ("Findings & Conclusions").  The motions were brought by Plaintiffs San Luis & Delta-Mendota Water Authority and Westlands Water District (collectively "San Luis

1

Plaintiffs"). Docs. 164, 230, 233. Plaintiffs State Water

Contractors, Stockton East Water District, Oakdale Irrigation

District, and South San Joaquin Irrigation District; and

Plaintiff-Intervenor California Department of Water Resources

("DWR") filed statements of non-opposition regarding San Luis

Plaintiffs' request to enjoin Action IV.2.1. Docs. 247, 248,

251. The motion regarding Action IV.2.3 was joined by plaintiffs

Kern County Water Agency and Coalition for a Sustainable Delta.

Doc. 181. DWR filed a partial joinder in and statement of non-

opposition to the Action IV.2.3 motion. Doc. 249.

The Findings and Conclusions explained that the requested

relief could not be ordered without further evidence to establish

that the requested relief would not violate section 7 of the

federal Endangered Species Act ("ESA"). Specifically,

"[i]njunctive relief cannot be imposed without up-to-date

evidence of the status of the species to assure that altered

operations will not deepen jeopardy to the affected species or

otherwise violate other laws." Findings & Conclusions 134:4-7.

A hearing to address the proposed injunction and any imminence of

harm to the species was scheduled for May 19, 2010. Findings &

Conclusions 134:21-23. After hearing argument from the parties

on May 19, further proceedings were scheduled for May 25, 2010.

5/19/10 Rough Tr. 39:16-19.

Plaintiffs filed the declarations of Terry Erlewine (Doc.

356) and Bradley Cavallo (Doc. 358), and exhibits thereto. Federal Defendants filed the declarations of Jeffrey Stuart and exhibits thereto (Doc. 364) and Ronald Milligan (Doc. 366), and a partial joinder in Defendant-Intervenors' supplemental opposition (Doc. 369).  Defendant-Intervenors filed a supplemental memorandum in opposition to Plaintiffs' motions for preliminary Injunction (Doc. 365), and a related request for judicial notice (Doc. 368) and supporting declaration (Doc. 368-2).  At the May 25, 2010 hearing, the parties presented evidence concerning the status of the species

The original Findings and Conclusions are incorporated by this reference.  After considering additional testimony, exhibits received in evidence, the parties' additional submissions, and oral arguments, the Court makes these supplemental findings of fact and conclusions of law.

To the extent any finding of fact may be interpreted as a conclusion of law or any conclusion of law may be interpreted as a finding of fact, it is so intended.

## II. FINDINGS OF FACT

A.   Limited Time Period.

1.   Under the National Marine Fisheries Service's ("NMFS") June 4, 2009 Biological Opinion ("BiOp" or "Salmonid BiOp"), the pumping restrictions associated with Action IV.2.1 terminate May 31.  BiOp at 641-42.  The proposed injunction would enjoin the

3

implementation of Action IV.2.1 from May 26 to May 31, 2010 only.

2.     Under the BiOp, the pumping restrictions associated with Action IV.2.3 terminate on June 15 or when the average daily water temperature at Mossdale is greater than 72° Fahrenheit for seven consecutive days, whichever is sooner.  BiOp at 650.

3.     Given the time limit in the BiOp, the proposed injunction against Action IV.2.3 will be in effect at most from May 26 to June 15, 2010.  The requested injunction includes a three day "ramping-up" period, during which time exports will be gradually increased.  5/25/10 Rough Tr. 207:25-208:8.

B.    Current Status Of The Species.

4.     The parties agreed at the May 25 hearing that only the current status of the Central Valley spring-run Chinook salmon ("spring-run") and Central Valley steelhead ("CV steelhead") are relevant to the requested relief.[1]  5/25/10 Rough Tr. 20:1-21:9; 37:13-38:5; 5/25/10 Rough Tr. 139:22-25.  These findings focus on these two species.

(1)   Central Valley Spring-Run Chinook Salmon (*O. tshawytscha*).

5.     NMFS listed the spring-run as a "threatened" species under the ESA on January 5, 2006.  71 Fed. Reg. 834 (Jan. 5, 2006).  NMFS designated critical habitat for the spring-run on September 2, 2005.  70 Fed. Reg. 52,604 (Sept. 2, 2005).

_____

[1] Defendant-Intervenors advance an argument about fall-run Chinook salmon, which are not a listed species.

4

6.    The current population figure for spring-run returning in 2009 is 3,802 fish.  Gov't Salmon Exh. 102 at internal Exhibit 7.  This is a decrease from 10,828 returning spring-run adults in 2006, the last time this cohort spawned in the Central Valley. *Id.*; *id.*, ¶10.

7.    Mr. Stuart testified that based on the historical salvage data, the majority of spring-run emigrate through the Delta in April, with emigration tailing off into May and early June.  5/25/10 Rough Tr. 108:9-16.

8.    Mr. Cavallo estimated that 90 percent of the mixed pool of spring-run and fall-run Chinook young-of-the-year will exit the Delta by May 25, 2010.  5/25/10 Rough Tr. 23:21-24:1; DWR Ex. 519 at ¶7.  Mr. Stuart testified that typically 98 percent of the spring-run have passed through the Delta by the end of May. Gov't Salmon Ex. 102 at ¶12.  This means between 90 to 98 percent of spring-run are not within the influence or affect of the remedy sought by Plaintiffs.  5/25/10 Rough Tr. 207:21-24.

9.    The total direct seasonal loss of spring-run size Chinook salmon at the export facilities as of May 17, 2010, was 4,419 fish.  Gov't Salmon Ex. 102 at ¶12.  Mr. Stuart testified that the Salmonid BiOp does not use spring-run sized Chinook salmon as a metric to determine the ESA take limit.  5/25/10 Rough Tr. 150:18-20.  This is because spring-run Chinook are not reliably distinguishable from fall-run Chinook using a length at

1   date criteria.  5/25/10 Rough Tr. 21:17-22.  Instead, the one

2   percent incidental take limit for spring-run Chinook uses

3   hatchery late-fall Chinook salmon as surrogates for the yearling

4   spring-run.  5/25/10 Rough Tr. 150:6-10.

5

6        10.  Mr. Stuart testified that if the proposed preliminary

7   injunction were issued, he did not anticipate that the incidental

8   take limit for yearling spring-run Chinook would be exceeded.

9   5/25/10 Rough Tr. 161:10-14.  However, the purpose of the

10  incidental take limit is to identify a point at which

11  reinitiation of consultation should occur.  3/31/10 Tr. 113:20-

12  22.  It is not the default level at which the facilities should

13  be operated.  If the RPA works as designed, the incidental take

14  limit should never be reached.  *Id.* at 113:25-114:7, 133:15-24.

15  Mr. Stuart's testified that the low number of steelhead taken at

16  the pumps is evidence that the RPA is "functioning" as it was

17  "designed."  *Id.*, 126: 12-20.

18

19       11.  Because spring-run and fall-run Chinook are

20  "indistinguishable when captured in the Delta or its salvage

21  facilities," the breakdown between spring-run and fall-run within

22  the 4,419 fish figure is unknown.  5/25/10 Rough Tr. 24:2-11,

23  31:5-18; *see* 5/25/10 Rough Tr. 147:20-23.  Mr. Cavallo opined

24  that it is "reasonable to assume ... that most of those fish

25  [4,419 salvage] are, in fact, fall-run."  5/25/10 Rough Tr. 31:5-

26  18.

27

28

12.  In the BiOp, NMFS stated that "for Chinook salmon, the losses are probably overestimated due to the inability to identify individuals to race (e.g., most Chinook salmon reported to be within the spring-run size category are actually fall-run)."  BiOp at 776; 5/25/10 Rough Tr. 143:21-12.  Mr. Stuart agreed with this statement.  5/25/10 Rough Tr. 144:4-12.

13.  Mr. Stuart testified that he was not aware of the existence of any studies that specifically determined late-emigrating spring-run Chinook are genetically diverse from fish that out-migrated at an earlier date.  5/25/10 Rough Tr. 157:18-25.  However, Mr. Stuart relied upon the McElhany study and his general knowledge as a molecular biologist to support his opinion that the tail of the spring-run possess specific genetic diversity that make them sufficiently valuable genetically and deserving of protection.  5/25/10 Rough Tr. 156:18-157:17.  Mr. Stuart's testimony has foundation, making this a dispute among scientists about the value in terms of genetic diversity of the tail end of the spring-run.  5/25/10 Rough Tr. 212:25-213:12.

14.  Mr. Stuart testified that he could not provide a quantified estimate of the proportion of the spring-run Chinook that have not exited the Delta that would have to be adversely affected before there is a negative impact on spatial or genetic diversity of the species.  5/25/10 Rough Tr. 159:20-24.

15.  There is no reasonable prospect that the proposed

remedy will salvage all of the remaining 2 to 10 percent of spring-run in the Delta.  5/25/10 Rough Tr. 208:9-16.

16.  Mr. Cavallo testified that the best available coded wire tag studies do not demonstrate any export related mortality effect for fish emigrating from the San Joaquin system.  5/25/10 Rough Tr. 39:1-24.  Mr. Cavallo also opined that the proposed remedy would not "significantly reduce the survival or recovery probability" of the spring-run, nor would it "significantly diminish the value of their critical habitat for survival or recovery."  *Id.*; DWR Ex. 519 at ¶12. "17.  This opinion that unlimited pumping will have no adverse effect on the species is contrary to the evidence.  There is ample record evidence that at elevated pumping levels, the hydrologic influence of exports directs the listed salmonids into areas of the Delta that are hostile because of temperature, toxics, and other influences.

17.  Mr. Stuart admitted he could not state unequivocally that the proposed injunction would result in jeopardy to the spring-run Chinook or would result in adverse modification to their critical habitat, nor could Mr. Stuart state that such jeopardy or adverse modification would be avoided.  5/25/10 Rough Tr., 160:9-19; *id.*, 174: 15-21.

 (2)  Central Valley Steelhead (*O. mykiss*).

18.  NMFS listed the CV steelhead as a "threatened" species under the ESA on January 5, 2006.  71 Fed. Reg. 834 (Jan. 5,

2006).   NMFS designated critical habitat for the CV steelhead on September 2, 2005.   70 Fed. Reg. 52,604.

19.   There is limited information on the overall population size of CV steelhead.   Findings & Conclusions 14:21-23.   However, Mr. Stuart testified to an approximate population of 3,000 adult steelhead spawners.   5/25/10 Rough Tr. 121:19-122:7.

20.   It is unknown what percentage of the total CV steelhead population is comprised of the Southern Sierra Nevada Diversity Group of CV steelhead.   5/25/10 Rough Tr. 67:1-8.

21.   Mr. Cavallo estimated that 87 percent of the CV non-clipped steelhead will have exited the Delta past Chipps Island by May 25, 2010.   DWR Ex. 519 at ¶9.   Mr. Stuart agreed with this estimate.   5/25/10 Rough Tr. 154:14-155:2.

22.   The incidental take limit for unmarked juvenile and adult CV steelhead is 3,000.   BiOp at 776.   Eight hundred seventy four (874) juvenile non-clipped CV steelhead have been salvaged so far this year.   5/25/10 Rough Tr.  155:3-8.   Daily salvage of non-clipped CV steelhead peaked toward the end of January or beginning of February, and then tapered off.   5/25/10 Rough Tr. 32:17-25.

23.   Mr. Stuart testified that if the proposed preliminary injunction were issued, he did not anticipate that the incidental take limit for CV steelhead would be exceeded.   5/25/10 Rough Tr. 155:9-14.   However, the incidental take limit is not the default

1  level at which the facilities should be operated.  If the RPA

2  works as designed, the incidental take limit should never be

3  reached.  *Id.* at 113:25-114:7, 133:15-24.

4      24.  Approximately 13% of the population of Central Valley

5  steelhead are within the influence of export operations.  Mr.

6  Stuart indicated that an important criteria in determining the

7  necessity of protection of the steelhead, particularly at this

8  time, is that the end of their run can extend into June.  5/25/10

9

10  Rough Tr. 211:17-24.

11      25.  Mr. Stuart opined that increased salvage of CV

12  steelhead that exhibit late migratory behavior would diminish the

13  genetic diversity present in the population.  Gov't Salmon Ex.

14  102 at ¶35.  Although Mr. Stuart acknowledged that he was not

15  aware of the existence of any studies that specifically showed

16  that late emigrating CV steelhead were genetically diverse from

17  fish that out-migrated at an earlier date, 5/25/10 Rough Tr.

18  157:10-14, he relied upon the McElhany study to support his

19  opinion that the tail run of the steelhead posses specific

20  genetic diversity that make them sufficiently valuable

21  genetically and deserving of protection.  5/25/10 Rough Tr.

22  212:16-25.  Mr. Stuart's testimony has record support, making

23  this a dispute among scientists about the value in terms of

24

25  genetic diversity of the tail end of the steelhead run.  5/25/10

26  Rough Tr. 212:25-213:12.

27

28

26.   Mr. Stuart testified that he could not provide a quantified estimate of the proportion of the CV steelhead that have not exited the Delta that would have to be adversely affected before an adverse impact on spatial or genetic diversity of the species, but recognized that any such proportion would be lower for the Southern Sierra Nevada diversity group because of their small population size.  5/25/10 Rough Tr., 160:4-8.

27.   Of the remaining 13 percent of the CV steelhead population potentially within the influence of the pumps, Mr. Stuart could not testify that there would be a total extirpation of this remaining percentage.  5/25/10 Rough Tr. 213:21-214:1.

28.   Mr. Cavallo opined that the proposed remedy would not "significantly reduce the survival or recovery probability" of the CV steelhead, nor would it "significantly diminish the value of their critical habitat for survival or recovery."  5/25/10 Rough Tr. 39:1-24; DWR Ex. 519 at ¶12.  This was based in part, however, on his unsupported conclusion that exports do not affect smolt survival.

29.   Mr. Stuart admitted he could not state unequivocally that the proposed injunction would result in jeopardy to the spring-run Chinook or would result in adverse modification to their critical habitat, nor could Mr. Stuart state that such jeopardy or adverse modification would be avoided.  5/25/10 Rough

Tr., 160:9-19; *id.*, 174: 15-21.

C.   <u>Findings Of Fact Regarding Operation Of The Projects For The Period Of May 26th Through June 15th (With RPA Actions IV.2.1 And IV.2.3 Enjoined).</u>

(1)   <u>Summary of RPA Actions IV.2.1 And IV.2.3.</u>

30.   RPA Action IV.2.1 limits combined water exports by the CVP and SWP based on San Joaquin River flows as measured at Vernalis.  BiOp at 642.  When flows at Vernalis range from 0 to 6,000 cfs, Action IV.2.1 limits combined CVP and SWP exports to 1,500 cfs.  BiOp at 642.  When flows at Vernalis range from 6,000 to 21,750, Action IV.2.1 imposes an inflow to combined CVP and SWP exports ratio of 4:1.  BiOp at 642.

31.   RPA Action IV.2.3 limits Old and Middle River ("OMR") flows to no more negative than -2,500 to -5,000 cubic feet per second ("cfs") between January 1 and June 15, or until the average daily water temperature at Mossdale is greater than 72 degrees Fahrenheit for one week, whichever occurs first.  BiOp at 648-50.

(2)   <u>The Delta Smelt BiOp and/or State Water Resources Control Board Decision D-1641 Will Likely Limit Combined Project Exports During The Period That The Injunction Applies.</u>

32.   If RPA Actions IV.2.1 and IV.2.3 are enjoined through June 15, 2010, the 2008 Delta Smelt Biological Opinion ("Smelt BiOp") would control Project operations between May 26th and June 15th, unless it is also enjoined.  The Smelt BiOp requires OMR flows to be no more negative than -1,250 to -5,000 cfs over a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

fourteen-day running average through June 30 or until water temperatures reach 25 degrees Celsius at Clifton Court. *See* Fourth Milligan Declaration (Gov't Salmon Exh. 105), ¶5.

33.   If the Delta Smelt BiOp is enjoined as well, State Water Resources Control Board Water Rights Decision 1641 ("D-1641") will control.  Declaration of Terry Erlewine in Support of Preliminary Injunction ("Erlewine Decl.") (Doc. No. 356; SWC Ex. 968) ¶2; D-1641 (SWC Ex. 965); 5/25/10 Rough Tr. 79:4-8.

34.   D-1641 sets forth requirements that the Projects must meet in order to implement applicable water quality and other objectives for the Delta.  *See* Erlewine Decl. (SWC Ex. 968) at A-1; D-1641 (SWC Ex. 965) at 1.

35.   Two specific restrictions in D-1641 are likely to control combined Project pumping on various days in the period from May 26 to June 15, 2010, the 35% Export/Inflow (E/I) ratio and the "spring X2" standard.  Specifically, D-1641 limits Project exports to a combined total of not more than 35% of total Delta inflow and further limits Project operations to ensure that certain water quality standards are met as measured by the location of X2 (2.64 mmhos/cm electrical conductivity).  5/25/10 Rough Tr. 80:21-81:1, 92:22-24; Erlewine Decl. (SWC Ex. 968) at ¶¶ 5, 11; D-1641 (SWC Ex. 965).

1

        a.   **Project Exports Are Currently Limited By D-1641 To A Combined Total of Not More than 35% of Total Delta Inflow.**

2

3       36.   D-1641 requires that the Projects export a total of not

4  more than 35% of Delta inflows during the period of February

5  through June.  Erlewine Decl. (SWC Exs. 968) Exhibit A at A-5; D-

6  1641 (SWC Ex. 965) at 5; 5/25/10 Rough Tr. 80:21-24.  Delta

7  inflow is the combined total of the Sacramento River inflow at

8  Freeport, the Yolo Bypass inflow, inflow from streams including

9  the Mokelumne River and the San Joaquin River, and all other

10 flows entering the Delta.  5/25/10 Rough Tr. 81:10-14.

11

12      37.   Total Delta inflows and outflows are reported daily,

13 including on the Bureau of Reclamation's ("Reclamation") website.

14 5/25/10 Rough Tr. 81:16-18; see also Erlewine Decl. (SWC Ex. 968)

15 at ¶5; Erlewine Decl. Exhibit B (SWC Ex. 968).

16

17      38.   For the calculation of maximum percent Delta inflow

18 diverted, the export rate is a 3-day running average and the

19 Delta inflow is a 14-day running average, except when the CVP or

20 the SWP is making storage withdrawals for export, in which case

21 both the export rate and the Delta inflow are 3-day running

22 averages.  Erlewine Decl. Exhibit A (SWC Exs. 968) at A-7; D-1641

23 (SWC Ex. 965) at 7; 5/25/10 Rough Tr. 86:4-9.

24 //

25 //

26 //

27

28
                                     14

       **b.**   **Combined Project Exports Are Also Limited by D-1641's Requirement That X2 Be Maintained At Specified Locations.**

39.  During February through June, D-1641 requires that exports be limited to ensure that X2 is positioned at one of three locations in the western Delta, most notably near Chipps Island, based on unimpaired runoff as indicated by the Central Valley 8-Stream/River Index.  Erlewine Decl. (SWC Ex. 968) ¶11; Erlewine Decl. Exhibit A (SWC Exs. 968) at A-9, fn (b); D-1641 (SWC Ex. 965) at 9, fn(b); *see also* 5/25/10 Rough Tr. 93:5-10 (the purpose of maintaining X2 near Chipps Island is "to keep salinity low").

40.  More specifically, this spring X2 standard operates in addition to the 35% E/I ratio limitation described above and requires that Project exports be limited to hold X2 at or westerly of Chipps Island on a daily or 14-day average basis and, in any event, to provide Delta outflows of at least 11,400 cubic feet per second ("cfs").  Erlewine Decl. (SWC Exs. 965, 968) ¶11; Erlewine Decl. Exhibit A (SWC Ex. 968) at A-9; D-1641 (SWC Ex. 965) at 9.

       **c.**   **The Anticipated Effect Of D-1641.**

41.  Although it cannot be estimated with certainty what total Delta inflows will be in the upcoming weeks, Mr. Erlewine prepared two sets of hydrology projections to determine what Project operations would likely be between May 26th and June

15th, given D-1641's requirement that Projects export be no greater than 35% of Delta inflows. Erlewine Decl. (SWC Ex. 968) at ¶6.

42.   The first projection assumed that total Delta inflows from all sources would continue to decline through June 15th. Erlewine Decl. (SWC Ex. 968) at ¶7 and Table 1; Erlewine Decl. Exhibit C (SWC Ex. 967).  Under that scenario, total Project exports are likely to progressively decline from 7,300 cfs to 5,100 cfs between May 26th and June 15th.  Erlewine Decl. (SWC Ex. 968) at ¶7 and Table 1; Erlewine Decl. Exhibit C (SWC Ex. 967).  This decline in Project exports does not directly correlate to OMR flows, but the OMR flows under this projection would likely range from approximately -4,691 cfs to -5,432 cfs during the same May to June period.  Erlewine Decl. (SWC Ex. 968) at ¶¶ 8-9 and Table 1; Erlewine Exhibit D (SWC Ex. 968).

43.   The second projection assumed that total Delta inflows would remain constant through June 15th.  Erlewine Decl. (SWC Ex. 968) at ¶10 and Table 1.  As of May 25, 2010, it appears that San Joaquin River flows will likely remain about 4,000 cfs through the first week of June due to releases caused by snow melt and for flood control purposes on the Tuolumne River.  5/25/10 Rough Tr. 87:15-22, 99:8-11.  Under this scenario, total Project exports are likely to remain steady at approximately 7,500 cfs, and OMR flows would range between -5,350 cfs and

-6,000 cfs.  Erlewine Decl. (Doc. No. 356) at ¶10 and Table 1.

44.  Regarding D-1641's further restrictions vis-à-vis the location of X2 through June 15, and based on current water quality, Delta inflow patterns, and other conditions, it is "nearly certain" that the spring X2 limitation will be triggered in June, likely for a period of at least 20 days.  Erlewine Decl. (SWC Ex. 968), ¶11; Milligan Decl., Gov't Salmon Ex. 105), ¶9; 5/25/10 Rough Tr. 94:1.  Although the Project operators have discretion about which 20 days in June will be utilized to meet the D-1641 spring X2 requirement, it is likely the 20 day period will occur earlier in the month.  5/25/10 Rough Tr. 98:9-14.   To meet these further restrictions, "Project exports would have to be reduced to levels more restrictive than those summarized above" related to the 35% limitation.  Erlewine Decl. (SWC Ex. 968) ¶11.  These additional restrictions will further reduce the magnitude of reverse flows in Old and Middle Rivers to a likely range of -5,700 cfs to less negative than -3,000 cfs and, ultimately, will lower the rate of combined Project exports to a range well below 7,000 cfs, to as low as 3,000 cfs.  Erlewine Decl. (SWC Ex. 968) ¶11; 5/25/10 Rough Tr. 95:5-7.

(3)  Ramping Period And Daily Monitoring.

45.  Plaintiffs proposed that Project operations not be instantaneously operated at the highest allowable levels of exports under D-1641, but instead that exports be ramped up from

17

their current levels to higher levels over a three day period beginning May 26, 2010 if Actions IV.2.1 and IV.2.3 are enjoined. 5/25/10 Rough Tr. 200:10-15.

46.   In conjunction with ramping up and throughout the period of injunctive relief, NMFS, Reclamation and DWR will be ordered to monitor take at the CVP and SWP export pumps on a day-by-day basis.   If NMFS or Reclamation believe that any increased salvage is sufficient to jeopardize either the spring-run Chinook or CV steelhead species, or there is adverse modification to the species' critical habitat, they may immediately file notice seeking to dissolve the injunctive relief.   5/25/10 Rough Tr., 215:23-216:3.   Any such application will be heard on shortened time.

    (4)   Salvage-Triggered OMR Flow Restrictions Remain In Effect.

47.   Plaintiffs propose that Action IV.2.3's calendar-based -5,000 cfstrigger be enjoined, but that its salvage triggers remain in effect.   Therefore, if during the period May 26 through June 15, the density of juvenile salmonid losses at the export pumps increases sufficiently to pose an increased risk to the species as contemplated by these salvage-based triggers, export pumping will be reduced to meet Action IV.2.3's OMR flow restrictions.   BiOp at 648-52.

# III. CONCLUSIONS OF LAW

**A.    Legal Standards For Injunctive Relief.**

1.    Plaintiffs must establish four factors by a preponderance of the evidence to receive temporary injunctive relief:

> (1)   Likelihood of success on the merits;
>
> (2)   Likelihood the moving party will suffer irreparable harm absent injunctive relief;
>
> (3)   The balance of equities tips in the moving parties' favor; and
>
> (4)   An injunction is in the public interest.

*Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008); *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

2.    As explained in the Findings and Conclusions, Plaintiffs have already succeeded on their NEPA claim and have shown a likelihood of success on the merits of the ESA claims raised in their preliminary injunction motion.  Findings & Conclusions 129:2-3; 130:11-12.  Additionally, Plaintiffs have shown a likelihood of irreparable harm from loss of water supply. Findings & Conclusions 69:6 – 85:17; 5/25/10 Rough Tr. 204:8 – 205:7.  Plaintiffs have further shown that the balance of harms and the public interest favor injunctive relief, provided such relief will increase the water supply available to the CVP and SWP without jeopardizing the continued existence of the species and/or adversely modifying their critical habitats.  Findings &

19

Conclusions 134:4-20.

B.   <u>Central Valley Spring-Run Chinook Salmon.</u>

3.   Plaintiffs' expert Mr. Cavallo testified that if Plaintiffs' injunction were granted, operations would not jeopardize the spring-run Chinook salmon or adversely modify its critical habitat.  5/25/10 Rough Tr. 39:1-24; DWR Ex. 519 at ¶12.

4.   On cross examination, NMFS's expert Mr. Stuart could not say whether or not these injunctions will jeopardize the continued existence of the species or adversely impact their habitats.  5/25/10 Rough Tr. 210:18-25; 160:9-19.

5.   The small percentage of the population in the area of concern that might be potentially affected by the injunction and the fact that there is no reasonable prospect that all of the remaining spring-run Chinook will be subject to salvage justifies the conclusion that the short period of injunctive relief requested will not deepen the jeopardy or adversely modify the critical habitat of the spring-run.  5/25/10 Rough Tr. 208:4-16.

C.   <u>Central Valley Steelhead.</u>

6.   Mr. Stuart testified that the tail end of the CV steelhead migration was important to the species as a whole due to a genetic characteristic for late migration.  Gov't Salmon Ex. 102 at ¶35.  Mr. Cavallo disagreed and stated there was no evidence of a genetic difference between CV steelhead that migrate during the other portions of the migration period and the

late migratory steelhead.  5/25/10 Rough Tr. 33:20-34:24.  This is a scientific dispute that must be resolved in favor of the government.

7.   Mr. Stuart testified that he could not opine whether or not the proposed injunction would jeopardize the CV steelhead or adversely modify their critical habitat.  5/25/10 Rough Tr. 160:9-19.

8.   Only a small percentage of the population remains in the area of concern that might be potentially affected by the injunction.  In addition, there is no reasonable prospect that all of the remaining individuals in the tail end of the CV steelheads' migration would be subject to salvage or extirpation, and therefore any important genetic contribution from these late-migrating individuals to the overall species will remain even if the injunction is granted.  5/25/10 Rough Tr. 214:16-20.

9.   Accordingly, granting the requested injunction is not likely to deepen the jeopardy of the the CV steelhead or destroy adversely modify its critical habitat during the limited period May 26 through June 15.

D.   <u>Green Sturgeon, Orca, And Winter-Run Chinook Salmon.</u>

10.   The parties agreed that the proposed injunction will not cause harm that would rise to the level of jeopardizing or adversely modifying the critical habitat of the green sturgeon, orcas, and winter-run Chinook.

E.    <u>Stay Pending Appeal.</u>

    11.   At the May 25, 2010 hearing, Federal Defendants and Defendant-Intervenors requested a stay pending appeal of the preliminary injunction ordered by this Court. This request was denied because any stay would effectively deprive Plaintiffs of any benefit of the preliminary injunction.

F.    <u>Bond.</u>

    12.   Plaintiffs are required to post a $5,000.00 bond.

SO ORDERED
Dated:  June 1, 2010

                              <u>/s/ Oliver W. Wanger</u>
                                Oliver W. Wanger
                            United States District Judge

22