UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELTA SMELT CONSOLIDATED CASES | 1:09-CV-1053 OWW DLB |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.* v. SALAZAR, *et al.* | MEMORANDUM DECISION AND ORDER RE SAN LUIS PLAINTIFFS' MOTIONS TO AUGMENT (DOC. 134) AND |
| STATE WATER CONTRACTORS v. SALAZAR, *et al.* | SUPPLEMENT (DOC. 139); AND STANISLAUS RIVER PLAINTIFFS' MOTION TO AUGMENT THE |
| COALITION FOR A SUSTAINABLE DELTA, *et al.* v. UNITED STATES FISH AND WILDLIFE SERVICE, *et al.* | ADMINISTRATIVE RECORD (145) |
| METROPOLITAN WATER DISTRICT v. UNITED STATES FISH AND WILDLIFE SERVICE, *et al.* | |
| STEWART & JASPER ORCHARDS *et al.* v. UNITED STATES FISH AND WILDLIFE SERVICE. | |

I. <u>INTRODUCTION</u>

Before the court for decision are three motions concerning the Administrative Record ("AR"):

- San Luis & Delta-Mendota Water Authority, Westlands Water District, State Water Contractors, Metropolitan Water District of Southern California, Kern County Water Agency, Coalition for a Sustainable Delta, Oakdale Irrigation District, South San Joaquin Irrigation District and Stockton

East Water District (collectively, "South Delta Plaintiffs")
seek to supplement the AR with 41 documents.  Docket 140.
South Delta Plaintiffs maintain that some of these documents
were improperly excluded from the AR (including documents
cited by water users in comment letters; comments, reports,
and studies submitted to Federal Defendants by the
Department of Water Resources ("DWR"); and documents cited
in the consultation history).  South Delta Plaintiffs seek
to augment the record with certain additional documents
under several of the recognized exceptions to the record
review rule.  Federal Defendants have agreed to supplement
the record with Documents 15-20 and 22 from this request,
but oppose supplementation as to the remaining documents.

- Stockton East Water District, Oakdale Irrigation District,
  and South San Joaquin Irrigation District ("Stanislaus River
  Plaintiffs") seek to supplement the AR with certain
  additional documents enumerated in Tables A-E attached to
  their motion.  Docket 146.  The Stanislaus River Plaintiffs
  incorporate the legal arguments of the South Delta
  Plaintiffs.  Federal Defendants have agreed to augment the
  record with all but 7 of the Documents listed in Table E.

- The South Delta Plaintiffs also seek to augment the AR with
  64 documents withheld under various claims of privilege.
  *See* Docket 135.  In its opposition, the National Marine

2

Fisheries Service ("NMFS") withdrew its privilege claims as to Documents 24-59, but opposes augmentation as to the remaining documents.

The parties agreed to submit these motions on the papers.

## II. ANALYSIS

### A. Motions to Supplement.

#### 1. Legal Framework.

The APA limits the scope of judicial review to the administrative record.  5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party.").  The administrative record is "not necessarily those documents that the agency has compiled and submitted as 'the' administrative record."  *Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).  Rather, "'[t]he whole record' includes everything that was before the agency pertaining to the merits of the decision."  *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).  "The 'whole' administrative record, therefore, consists of all documents and materials <u>directly or indirectly</u> considered by agency decision-makers and includes evidence contrary to the agency's position."  *Thompson*, 885 F.3d at 555 (emphasis added).

> An incomplete record must be viewed as a fictional account of the actual decisionmaking process. When it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate.

*Portland Audubon*, 984 F.2d at 1548 (internal quotations and

3

citations omitted); *see also Asarco, Inc. v. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant facts.").

However, the record does not include "every scrap of paper that could or might have been created" on a subject. *TOMAC v. Norton*, 193 F. Supp. 2d 182, 195 (D.D.C. 2002).

> A broad application of the phrase "before the agency" would undermine the value of judicial review: Interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless. Thus, to ensure fair review of an agency decision, a reviewing court should have before it neither more nor less information than did the agency when it made its decision.

*Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (internal citations and quotations omitted).  The record certainly need not include documents that became available after the agency's decision had already been made ("post-decisional" documents).  *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555 (1978)(judicial review is "limited [] by the time at which the decision was made....");  *Karuk tribe v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1090 (N.D. Cal. 2005)(court "may not consider information created

4

during the litigation that was not available at the time the
[agency] made its decision")(citations omitted).

    2.   <u>Presumption of Regularity.</u>

    An agency's designation and certification of the AR is
entitled to a presumption of regularity.  *McCrary v. Gutierrez*,
495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007)(citing *Bar MK Ranches
v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)).  Absent "clear
evidence to the contrary" a court must presume that an agency has
"properly discharged [its] official duties."  *United States v.
Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926); *see also Bar
MK Ranches*, 994 F.2d at 73-40 (while the agency "may not
unilaterally determine what constitutes the administrative
record" the courts "assume[] the agency properly designated the
[AR] absent clear evidence to the contrary").

    Plaintiffs bear the burden of overcoming this presumption.
*See id.*; *Glasser v. NMFS*, 2008 WL 114913, *1 (W.D. Wash. Jan. 10
2008)(plaintiffs seeking to supplement the AR must present "clear
evidence sufficient to overcome the presumption of administrative
regularity....").  Specifically, Plaintiffs must present clear
evidence that the existing AR is so inadequate that it will
frustrate judicial review.  *Rybacheck v. EPA*, 904 F.2d 1276, 1296
n.25 (9th Cir. 1990)(denying motion to supplement where "original
record [] adequately explains the basis of [the agency's]
decision and demonstrates that the [agency] considered the

relevant factors").

Plaintiffs do not dispute the applicability of this presumption and that they bear the burden of overcoming it. *See* Docket 140 at 8.  Instead, Plaintiffs maintain that, "[h]ere, it is clear that the NMFS Record was not properly assembled." *Id*. Plaintiffs observe that Federal Defendants have already submitted five versions of the NFMS record, twice because they failed to include thousands of documents. *Id.* Moreover, Plaintiffs assert that the index to the NMFS AR is "riddled with inaccuracies and misnumbering..." *Id*.  This, Plaintiffs suggest, is sufficient to overcome the presumption of regularity.

It is neither irregular nor particularly surprising that in this complex case, brought on an expedited basis due to the urgent nature of Plaintiffs' requests for relief, some documents that belong in the AR were inadvertently omitted.  The parties have had to communicate and cooperate with each other extensively to clarify the AR's content, and some technical inaccuracies in the AR's index have been discovered.  Plaintiffs have not presented evidence sufficient to overcome the presumption of regularity.  It is necessary, then, to examine Plaintiffs' specific contentions in detail to determine whether they have otherwise met their burden as to specific categories of documents.

1

        3.    **South Delta Plaintiffs' Motion to Supplement**

2

              a.    **Documents Plaintiffs' Claim Were Improperly**
                    **Excluded From the Record.**

3

                    (1)    **Scientific Reports and Peer-Reviewed Articles**
                           **Cited To Federal Defendants By Water Users**

4

                           **(Documents 1-14).**

5

        The South Delta Plaintiffs seek to supplement the AR with

6

Documents 1-14, scientific reports and peer-reviewed articles

7

cited to NMFS for its consideration in the course of its

8

preparation of the 2009 BiOp.  Documents 4-6, 10, 11, are reports

9

and articles referenced by a September 24, 2008 comment letter

10

sent by the San Luis & Delta-Mendota Water Authority

11

("Authority") and the State Water Contractors ("SWC") to Federal

12

Defendants.  The letter was included in the administrative

13

record.  Although some of the cited references are included in

14

the AR, Documents 4-6, 10, and 11 were omitted.

15

        Documents 1-3, 7-9, and 12-14 were on a reference list

16

attached to a May 27, 2009 letter sent by the Authority and the

17

SWC to NMFS with comments on the draft salmon biological opinion

18

dated December 11, 2008.  This comment letter was included in the

19

administrative record, as were some of the listed references, but

20

Documents 1-3, 7-9, and 12-14 were excluded.

21

        Plaintiffs assert that each of these documents should be

22

added to the record because the document was "cited to NMFS

23

before the 2009 BiOp was issued in comment letters that the

24

Federal Defendants have included in the administrative record."

25

26

27

28

Docket 140 at 8-9.

There is ample authority supporting the proposition that the agency must consider <u>relevant</u> data or reports <u>presented to it</u> prior to completion of a biological opinion. *See Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 366-67 (E.D. Cal. 2007) (holding that the Service was required to consider species' population abundance data presented to it one week before completion of the biological opinion); *see also Grand Canyon Trust v. U.S. Bureau of Reclamation*, 2009 WL 941341, at *4-*5 (D. Ariz. Apr. 6, 2009) (holding agency must consider relevant report presented to it two weeks before completion of the biological opinion).

Plaintiffs' assert that *Kempthorne* and *Grand Canyon Trust* stand for the proposition that <u>any</u> document placed before the agency prior to the issuance of the BiOp must be included in the AR. This is not the law. For example, in *Defenders of Wildlife v. Dalton*, 24 C.I.T 1116, 2000 WL 1562928, at *1120-21 (C.I.T. 2000), the Court of International Trade refused to supplement the administrative record with attachments to comment letters absent evidence that those attachments were considered either directly or indirectly by the relevant decisionmakers. Plaintiffs point to no absolutely no authority that requires an agency to track down documents <u>referenced</u> in a comment letter but not attached thereto. This would be an unworkable rule, as it would permit a

8

party to force into the record any number of references,

regardless of relevance, simply by attaching to a comment letter

a list of references on a particular subject.

Plaintiffs' request to supplement the record with Documents

1-14 on the ground that the documents were referenced in comment

letters is DENIED.

(2)   Documents Referenced in the Consultation
History (Document 21).

Plaintiffs seek to supplement the record with Document 21, a

compilation of declarations from *PCFFA v. Gutierrez*, 1:06-cv-245

OWW (E.D. Cal.).   These declarations are referenced at page 33 of

the 2009 Salmonid BiOp, in a section of the BiOp entitled

"consultation history," which indicates that the declarations

were considered by the agency in preparing the BiOp.

> This document is NMFS' Opinion on the proposed action,
> in accordance with section 7 of the Endangered Species
> Act (ESA) of 1973, as amended (16 U.S.C. 1531 et seq.).
> The request for formal consultation was received on
> October 1, 2008. This final Opinion supersedes the 2004
> CVP/SWP operations Opinion. This Opinion is based on:
> (1) the reinitiation package provided by Reclamation,
> including the CVP/SWP operations BA, received by NMFS
> on October 1, 2008; (2) the supplemental analysis of
> effects on the proposed critical habitat of Southern
> DPS of green sturgeon and supplemental information
> regarding the EFH assessment on fall-run; (3) other
> supplemental information provided by Reclamation; (4)
> declarations submitted in court proceedings pursuant to
> *Pacific Coast Federation of Fishermen Association
> (PCFFA) et al. v. Gutierrez et al.*; and (5) scientific
> literature and reports. A complete administrative
> record of this consultation is on file at the NMFS,
> Sacramento Area Office.

BiOp at 33 (emphasis added).

Federal Defendants nevertheless oppose supplementation of

9

the record with these declarations:

> The product of litigation, these declarations have no
> place in the agencies' consideration of the "best
> available science." The factual matters discussed in
> these declarations are thoroughly documented in the
> BiOp and the current record and Plaintiffs do not even
> attempt to represent to the contrary. To the extent a
> party seeks to rely on these declarations, they must
> submit a request for judicial notice as is frequently
> done in this ongoing litigation.

Docket 227 at 12.

Federal Defendants' position, taken in the context of litigation, is directly contradicted by the text of the BiOp. For this reason, and because the declarations would be subject to judicial notice in any event, Plaintiffs' motion to supplement the AR with Document 21 is GRANTED.

> **b.   Documents Plaintiffs Seek to Introduce Under One of the Exceptions to the Record Review Rule.**

In addition to permitting supplementation with documents that were part of the "whole record" but were excluded from the AR, the district court may also consider extra-record materials in an APA case under four narrow exceptions:

> (1) when it needs to determine whether the agency has
> considered all relevant factors and has explained its
> decision;
>
> (2) when the agency has relied upon documents or
> materials not included in the record;
>
> (3) when it is necessary to explain technical terms or
> complex matters; and
>
> (4) when a plaintiff makes a showing of agency bad
> faith.

*Southwest Center for Biological Diversity v. United States Forest*

10

*Service*, 100 F.3d 1443, 1450 (9th Cir. 1996).  However, before

extra-record material may be considered under any of these

exceptions, a plaintiff must first make a showing that the record

is inadequate.  *Animal Defense Council v. Hodel*, 840 F.2d 1432,

1437 (9th Cir. 1988) (review of extra-record evidence

inappropriate where plaintiff "makes no showing that the district

court needed to go outside the administrative record to determine

whether the [agency] ignored information").

Plaintiffs seek to supplement the record with certain

documents they contend fall within these recognized exceptions.

### (1)   Documents Pertaining to "Other Stressors."

#### (a)   Documents Pertaining to Predators (Documents 1, 4, 9, and 39-41).

Plaintiffs seek to supplement the record with Documents 1,

4, and 9 to "demonstrate the failure on the part of NMFS to give

appropriate consideration to the prevalence of centrarchids,

particularly the largemouth bass, in the Delta, and the degree to

which their predation on migrating salmon has compromised certain

salmonid ESUs as a result."  Docket 263 at 6.

Federal Defendants maintain that Documents 1 and 9 are

cumulative of the discussion that is contained in the BiOp

regarding predation and nonnative species.  *Id*. at 10-11, n. 4

(citing BiOp at 146-148, 154, 207, 215, 347-350, 374).  The cited

portions of the BiOp discuss, among other things, predation

patterns in various habitat and geographic locations and the

11

1    effect of water development activities on predation rates.

2          Plaintiffs offer Document 1, an article published by Lenny

3    Grimaldo, et al., which found that marsh edge habitats supported

4    a prominent abundance of centrarchids, a family of freshwater

5    fish to which the largemouth bass belongs.  Plaintiffs argue that

6    "[a]lthough the BiOp briefly mentions the fact that vegetated

7    channels provide coverage to largemouth bass (BiOp at 374), it

8    completely fails to consider Grimaldo's key observation regarding

9    the prevalence of largemouth bass in these vegetated corridors

10   and the impact of these largemouth bass on salmon migrating

11   through these corridors."  Docket 263 at 6.  But, Plaintiffs

12   misapply the "relevant factors" exception.  Document 1 does not

13   raise an entirely new factor that Federal Defendants failed to

14   consider.  Rather, it raises nuanced points about predation.  The

15   exceptions to the record review rule, including the "relevant

16   factors" exception, must be interpreted narrowly.  *See Ranchers*

17   *Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S.*

18   *Dept. of Agric.*, 499 F.3d 1108, 1117 (9th Cir. 2007).

19   Accordingly, the "relevant factors" exception only applies when

20   Federal Defendants fail to consider a general subject matter that

21   is demonstrably relevant to the outcome of the agency's decision,

22   not when specific hypotheses and/or conclusions are omitted from

23   consideration.  To hold otherwise would allow Plaintiffs to drive

24   a truck through what is supposed to be a narrow exception to the

1   record review rule.

2       The same applies to Document 9, an article authored by Mike

3   Chotowski, currently with the Bureau of Reclamation, which found

4   that nonnative centrarchids, including largemouth bass, dominate

5   vegetated habitats of the Delta.  Plaintiffs maintain that the

6   BiOp should have, but did not, consider the implications of

7   largemouth bass abundance on salmon populations.  Document 9

8   merely offers a nuanced point about predator populations; it does

9   not offer an entirely new consideration.

10       Likewise, Document 4, an article prepared by William J.

11  Kimmerer in 2001 that discusses population dynamics of the

12  striped bass, another known predator of salmon, does not point to

13  an entirely new "factor" Federal Defendants neglected to

14  consider.  The BiOp discusses striped bass predation of salmon,

15  BiOp at 147, 374.  That there is no specific discussion of

16  striped bass abundance does not require the conclusion that

17  Federal Defendants entirely failed to consider a relevant factor.

18       The same conclusion applies to Documents 39 and 40.

19  • Document 39 is a 1997 telemetry study by Gingras and
      McGee, which studied movements of striped bass through the
20    radial gates at Clifton Court Forebay to determine the
      feasibility of predator removal as a method to decrease
21    pre-screen loss of fish in CCF.

22  • Document 40, cited in Document 39, is a 1990 study by Kano
      on the occurrence and abundance of predator fish in CCF,
23    which discussed flow velocity in CCF and its effect on
      emigration of predators from CCF and found, among other
24    things, predator emigration to be greater than previously
      assumed, resulting in overestimates of predators and their
25    threat to listed species.

13

1    Document 41 is the final version of a draft study on

2    quantification of pre-screen loss of juvenile steelhead in

3    Clifton Court Forebay already in the record.  AR 00112850-

4    00113074.  Plaintiffs maintain that Document 41 should have been

5    included in the record because NMFS knew by April 17, 2009 that

6    the final report was available.  AR 00086690.  Critically, the

7    final study corrected an error in the draft report regarding how

8    the equation for pre-screen loss was documented.  Nevertheless,

9    the relevant factors exception cannot be used to supplement the

10   record with this document.  A final draft of a study already

11   considered by Federal Defendants cannot, *ipso facto*, direct

12   Federal Defendants' attention to an entirely new factor.

13        *Arguendo*, these studies may represent the "best available

14   science" regarding the impacts of predation on salmonids, such

15   that by failing to consider such evidence NMFS acted arbitrarily

16   and/or capriciously.  Plaintiffs, however, do not offer these

17   documents for that purpose.

18        The request to supplement the record with Documents 1, 4, 9

19   and 39-41 is DENIED WITHOUT PREJUDICE to a showing, supported by

20   expert opinion, that these documents are best available science

21   that was ignored or given insufficient weight.

22                    (b)   Documents Pertaining to Pesticides
                            (Documents 2 and 24-31).

23        Plaintiffs offer Documents 2 and 24-31, which concern the

24   impacts of pesticides on salmonids.  Plaintiffs acknowledge that

                                  14

the BiOp discusses pesticides, but maintain that the BiOp "vastly understates the significance of the common pesticides and herbicides on the species."  Docket 263 at 8 (citing BiOp at 91, 128, 130-33, 139-43, 197, 446, 518, 558, 629 as examples of how the BiOp acknowledges the presence of contaminants and adverse impacts that <u>may</u> result from exposure to contaminants, and BiOp at 467, 499, 547, 554, 567, as examples of where the BiOp attempts to "place blame for exposure to contaminants on CVP/SWP operations").

Document 2 is a NOAA Fisheries 2008 biological opinion on the Environmental Protection Agency's Registration of Pesticides containing Chlorpyrifos, which reaches a jeopardy determination ("Chlorpyrifos BiOp").  Federal Defendants argue that Document 2 is "cumulative" of the BiOp's general references to pesticides. Document 227 at 12.  Plaintiffs respond that the jeopardy determination in Document 2 is a relevant factor that NMFS failed to consider in its analysis:

> Nowhere does the 2009 NMFS BiOp acknowledge NMFS's own prior conclusions that Chloropyrifos, Diazinon and Malathion <u>have</u> harmed the listed species, are likely to jeopardize the winter-run and spring-run Chinook salmon and Central Valley Steelhead, and are likely to result in the destruction or adverse modification of critical habitat of these species.

Document 263 at 8.

This argument touches upon an issue that goes to the heart of many of Plaintiffs' merits arguments.  Plaintiffs suggest that the BiOp's own jeopardy determination regarding the impacts of

15

coordinated operations on salmonids did not sufficiently consider the detrimental impacts of other "relevant factors" on the salmonids.  That another stressor was found to jeopardize salmonids does not necessarily undermine the jeopardy conclusion in the BiOp.  Rather, the BiOp must support its conclusions regarding the impact to the species caused by coordinated operations.  Moreover, so long as pesticides are not entirely omitted (or are so cursorily considered as to be effectively omitted) from the analysis, additional information on the impact of pesticides cannot come in under the relevant factors exception.  If these documents establish that NMFS acted arbitrarily and capriciously by effectively ignoring a substantial factor, this must be demonstrated by expert opinion.

     The same conclusion applies to Documents 24-31.  Plaintiffs argue that these documents "fill gaps in NMFS's reasoning regarding specific pesticides or specific sources of exposure not covered in the BiOp," but do no more than roughly summarize the contents of these Documents as follows:

> Documents 24 – 29 are scientific studies, all but one of which were peer-reviewed and published in scientific journals, which evaluate the harmful effects from specific pesticides or specific sources of exposure within the Delta.  See Docs. 24 (impacts of pyrethroids from Sacramento urban drainage water), 25 (impacts of low levels of pesticides on immune systems), 26 (impacts of pyrethroids from urban creeks in the Sacramento area), 27 (impacts of pesticides in the Yolo Bypass), 28 (impacts of pesticides and herbicides throughout salmonid habitat), 29 (pesticide impacts transferred from parent to progeny); see also Docs. 30 and 31 (both addressing effects of ammonia on food availability).  The 2009 BiOp does not evaluate these effects or

1
2
3
4
5

quantify them as part of the baseline.  Given NMFS's
jeopardy determination for pesticides, this body of
materials either must have been intentionally omitted
from the 2009 BiOp record, or recklessly overlooked and
not used in its analysis.  Admission of the documents
is necessary to show the relevant factors and best
available science that NMFS ignored without
explanation.

6
7
8
9
10

Doc. 140 at 16.  It is Plaintiffs' burden to demonstrate that the existing record is insufficient.  Given that the BiOp does discuss the impacts of pesticides on salmonids, these general descriptions coupled with the general assertion that they "fill gaps" in the record is insufficient.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Alternatively, Plaintiffs argue that Documents 2 and 24-31 are "necessary to explain the complex issue of pesticide and ammonia impacts to the listed species" and that "these studies explain the manner and magnitude of impacts from a major stressor to the listed species."  Doc. 263 at 8.  But, the BiOp does discuss the effect of ammonia on salmonids.  *See* BiOp at 157 (discussing impact of ammonia from the City of Stockton's Wastewater Treatment Plant on dissolved oxygen levels); 446 (noting that agricultural ammonia releases may affect salmonid habitat).  Plaintiffs' suggested additions to the record do not suggest new relevant factors.  Rather, Plaintiffs suggest that Federal Defendants did not give ammonia sufficient weight.  These documents do not fall within the "relevant factors" exception.

26
27

The request to supplement the record with Documents 2 and 24-31 is DENIED WITHOUT PREJUDICE.

28

17

1

(c)   <u>Hatcheries (Documents 13, 34, and 35)</u>

2

Documents 13, 34, and 35 discuss the effects interbreeding

3

of hatchery salmon with wild salmon have on the fitness of wild

4

fish.  The BiOp discusses hatchery impacts on genetic diversity,

5

BiOp at 87-88, 95, 109, the contribution of hatcheries to the

6

collapse of the fall run, *id*. at 142, as well as an entire

7

section entitled "Hatchery Operation and Practices," which

8

discusses a number of impacts:

9

10

11

12

13

14

15

16

17

18

19

20

21

Five hatcheries currently produce Chinook salmon in the
Central Valley, and four of these also produce
steelhead. Releasing large numbers of hatchery fish can
pose a threat to wild Chinook salmon and steelhead
stocks through genetic impacts, competition for food
and other resources between hatchery and wild fish,
predation of hatchery fish on wild fish, and increased
fishing pressure on wild stocks as a result of hatchery
production (Waples 1991). The genetic impacts of
artificial propagation programs in the Central Valley
are primarily caused by straying of hatchery fish and
the subsequent interbreeding of hatchery fish with wild
fish. In the Central Valley, practices such as
transferring eggs between hatcheries and trucking
smolts to distant sites for release contribute to
elevated straying levels [U.S. Department of the
Interior (DOI) 1999]. For example, Nimbus Hatchery on
the American River rears Eel River steelhead stock and
releases these fish in the Sacramento River basin. One
of the recommendations in the Joint Hatchery Review
Report (NMFS and CDFG 2001) was to identify and
designate new sources of steelhead brood stock to
replace the current Eel River origin brood stock.

22

23

24

25

26

27

28

Hatchery practices as well as spatial and temporal
overlaps of habitat use and spawning activity between
spring- and fall-run fish have led to the hybridization
and homogenization of some subpopulations (CDFG 1998).
As early as the 1960s, Slater (1963) observed that
spring-run and early fall-run were competing for
spawning sites in the Sacramento River below Keswick
Dam, and speculated that the two runs may have
hybridized. Spring-run from the FRFH have been
documented as straying throughout the Central Valley
for many years (CDFG 1998), and in many cases have been
recovered from the spawning grounds of fall-run, an
indication that FRFH spring-run may exhibit fall-run

18

1   life history characteristics. Although the degree of
    hybridization has not been comprehensively determined,
2   it is clear that the populations of spring-run spawning
    in the Feather River and counted at RBDD contain
3   hybridized fish.

4   The management of hatcheries, such as Nimbus Fish
    Hatchery and FRFH, can directly impact spring-run and
5   steelhead populations by oversaturating the natural
    carrying capacity of the limited habitat available
6   below dams. In the case of the Feather River,
    significant redd superimposition occurs in-river due to
7   hatchery overproduction and the inability to physically
    separate spring-run and fall-run adults. This
8   concurrent spawning has led to hybridization between
    the spring-run and fall-run in the Feather River. At
9   Nimbus Hatchery, operating Folsom Dam to meet
    temperature requirements for returning hatchery fall-
10  run often limits the amount if water available for
    steelhead spawning and rearing the rest of the year.
11
    The increase in Central Valley hatchery production has
12  reversed the composition of the steelhead population,
    from 88 percent naturally-produced fish in the 1950s
13  (McEwan 2001) to an estimated 23 to 37 percent
    naturally-produced fish currently (Nobriga and Cadrett
14  2003). The increase in hatchery steelhead production
    proportionate to the wild population has reduced the
15  viability of the wild steelhead populations, increased
    the use of out-of-basin stocks for hatchery production,
16  and increased straying (NMFS and CDFG 2001). Thus, the
    ability of natural populations to successfully
17  reproduce and continue their genetic integrity likely
    has been diminished.
18
    The relatively low number of spawners needed to sustain
19  a hatchery population can result in high harvest-to-
    escapements ratios in waters where fishing regulations
20  are set according to hatchery population. This can lead
    to over-exploitation and reduction in the size of wild
21  populations existing in the same system as hatchery
    populations due to incidental bycatch (McEwan 2001).
22
    Hatcheries also can have some positive effects on
23  salmonid populations. Winter-run produced in the LSNFH
    are considered part of the winter-run ESU. Spring-run
24  produced in the FRFH are considered part of the spring-
    run ESU. Artificial propagation has been shown to be
25  effective in bolstering the numbers of naturally
    spawning fish in the short term under specific
26  scenarios. Artificial propagation programs can also aid
    in conserving genetic resources and guarding against
27  catastrophic loss of naturally spawned populations at
    critically low abundance levels, as was the case with
28  the winter-run population during the 1990s. However,

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

relative abundance is only one component of a viable salmonid population.

BiOp at 143-44.

Document 13 is a 2005 _editorial_ by Brown entitled "Understanding Central valley Chinook salmon and steelhead: it's time to get off the dime," that concludes "we have a poor understanding of the effects of [] hatcheries on naturally spawning salmonids," and suggests a comprehensive salmon research and monitoring program is necessary.  Plaintiffs fail to explain how this editorial demonstrates that Federal Defendants have failed to consider a relevant factor.

Document 34 is a 2007 study by Araki, et al., entitled "Genetic effects of captive breeding cause a rapid, cumulative fitness decline in the wild," which found a 37.5% fitness decline per captive-reared generation, suggesting even a few generations of domestication may have negative effects on natural reproduction in the wild.  Document 35, a 2004 study by Kostow, entitled "Differences in juvenile phenotypes and survival between hatchery stocks and a natural population provide evidence for modified selection due to captive breeding," found that new hatchery stock and naturally produced fish from the same parent gene pool had significant differences in fitness.  Plaintiffs argue that Documents 34 and 35 should be added to the record under the relevant factors exception because they "quantify the effect of hatchery interbreeding on wild fish in a manner that

20

has not been conducted in the past."  It does not appear that the BiOp has discussed the specific topic raised in these papers: the effect of hatchery stock on salmonid fitness.  This issue is arguably distinct enough from the effect of hatchery stock on genetic diversity to be considered a separate factor.  Documents 34 and 35 are admissible for this purpose only.

Plaintiffs also suggest that these Documents are admissible under the exception that permits extra-record evidence when necessary to aid the Court in understanding complex information But, the BiOp discusses the effects of hatchery fish on wild fish in detail.  Plaintiffs have not demonstrated why this discussion is insufficient, with the exception of the possible gap in discussion of the impact of hatchery fish on salmonid fitness.

Plaintiffs' request to supplement the record with Document 13 is DENIED.  Plaintiffs request to supplement the record with Documents 34 and 35 is GRANTED.  Documents 34 and 35 may be used to demonstrate that Federal Defendants failed to discuss the effect of hatchery stock on salmonid fitness.

(d)  Ocean Conditions (Documents 10, 11, 12, and 23).

Plaintiffs next offer Documents 10-12 and 23, which concern the impact of ocean conditions on salmonids.  The BiOp discusses the effects of ocean conditions in several places, most notably at pages 149-153, in a section entitled "Ocean Productivity":

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The time at which juvenile salmonids enter the marine environment marks a critical period in their life history. Studies have shown the greatest rates of growth and energy accumulation for Chinook salmon occur during the first 1 to 3 months after they enter the ocean (Francis and Mantua 2003, MacFarlane et al. 2008). Emigration periods and ocean entry can vary substantially among, and even within, races in the Central Valley. For example, winter-run typically rear in freshwater for 5-9 months and exhibit a peak emigration period in March and April. Spring-run emigration is more variable and can occur in December or January (soon after emergence as fry), or from October through March (after rearing for a year or more in freshwater; CVP/SWP operations BA). In contrast to Chinook salmon, steelhead tend to rear in freshwater environments longer (anywhere from 1 to 3 years) and their period of ocean entry can span many months. Juvenile steelhead presence at Chipps Island has been documented between at least October and July (CVP/SWP operations BA). While still acknowledging this variability in emigration patterns, the general statement can be made that Chinook salmon typically rear in freshwater environments for less than a year and enter the marine environment as subyearlings in late spring to early summer. Likewise, although steelhead life histories are more elastic, they typically enter the ocean in approximately the same time frame. This general timing pattern of ocean entry is commonly attributed to evolutionary adaptations that allow salmonids to take advantage of highly productive ocean conditions that typically occur off the California coast beginning in spring and extending into the fall (MacFarlane et al. 2008). Therefore, the conditions that juvenile salmonids encounter when they enter the ocean can play an important role in their early marine survival and eventual development into adults.

It is widely understood that variations in marine survival of salmon correspond with periods of cold and warm ocean conditions, with cold regimes being generally favorable for salmon survival and warm ones unfavorable (Behrenfeld et al. 2006, Wells et al. 2006). Peterson et al. (2006) provide evidence that growth and survival rates of salmon in the California Current off the Pacific Northwest can be linked to fluctuations in ocean conditions. An evaluation of conditions in the California Current since the late 1970s reveals a generally warm, unproductive regime that persisted until the late 1990s. This regime has been followed by a period of high variability that began with colder, more productive conditions lasting from 1999 to 2002. In general, salmon populations increased substantially during this period. However,

22

1    this brief cold cycle was immediately succeeded by a 4-
     year period of predominantly warm ocean conditions
2    beginning in late 2002, which appeared to have
     negatively impacted salmon populations in the
3    California Current (Peterson et al. 2006). Evidence
     suggests these regime shifts follow a more or less
4    linear pattern beginning with the amount and timing of
     nutrients provided by upwelling and passing "up" the
5    food chain from plankton to forage fish and eventually,
     salmon. There are also indications that these same
6    regime shifts affect the migration patterns of larger
     animals that prey on salmon (e.g., Pacific hake, sea
7    birds) resulting in a "top-down" effect as well
     (Peterson et al. 2006).
8
     Peterson et al. (2006) evaluated three sets of
9    ecosystem indicators to identify ecological properties
     associated with warm and cold ocean conditions and
10   determine how those conditions can affect salmon
     survival. The three sets of ecosystem indicators
11   include: (1) large-scale oceanic and atmospheric
     conditions [specifically, the Pacific Decadal
12   Oscillation (PDO) and the Multivariate ENSO Index]; (2)
     local observations of physical and biological ocean
13   conditions off northern Oregon (e.g., upwelling, water
     temperature, plankton species compositions, etc.); and
14   (3) biological sampling of juvenile salmon, plankton,
     forage fish, and Pacific hake (which prey on salmon).
15   When used collectively, this information can provide a
     general assessment of ocean conditions in the northern
16   California Current that pertain to multi-year warm or
     cold phases. It can also be used to develop a
17   qualitative evaluation for a particular year of the
     effect these ocean conditions have on juvenile salmon
18   when they enter the marine environment and the
     potential impact to returning adults in subsequent
19   years.

20   The generally warmer ocean conditions in the California
     Current that began to prevail in late 2002 have
21   resulted in coastal ocean temperatures remaining 1-2°C
     above normal through 2005. A review of the previously
22   mentioned indicators for 2005 revealed that almost all
     ecosystem indices were characteristic of poor ocean
23   conditions and reduced salmon survival. For instance,
     in addition to the high sea surface temperatures, the
24   spring transition, which marks the beginning of the
     upwelling season and typically occurs between March and
25   June, was very late, postponing upwelling until mid-
     July. In addition, the plankton species present during
26   that time were the smaller organisms with lower lipid
     contents associated with warmer water, as opposed to
27   the larger, lipid-rich organisms believed to be
     essential for salmon growth and survival throughout the
28   winter. The number of juvenile salmon collected during

                            23

1   trawl surveys was also lower than any other year
    previously sampled (going back to 1998, Peterson et al.
2   2006). Furthermore, although conditions in 2006
    appeared to have improved somewhat over those observed
3   in 2005 (e.g., sea surface temperature was cooler, the
    spring transition occurred earlier, and coastal
4   upwelling was more pronounced), not all parameters were
    necessarily "good." In fact, many of the indicators
5   were either "intermediate" (e.g., PDO, juvenile Chinook
    salmon presence in trawl surveys) or "poor" (e.g.,
6   copepod biodiversity, Peterson et al. 2006).

7   Updated information provided by Peterson et al. (2006)
    on the NWFSC Climate Change and Ocean Productivity
8   website shows the transition to colder ocean
    conditions, which began in 2007, has persisted
9   throughout 2008. All ocean indicators point toward a
    highly favorable marine environment for those juvenile
10  salmon that entered the ocean in 2008. After remaining
    neutral through much of 2007, PDO values became
11  negative (indicating a cold California Current) in late
    2007 and remained negative through at least August,
12  2008, with sea surface temperatures also remaining
    cold. Coastal upwelling was initiated early and will
13  likely be regarded as average overall. Furthermore, the
    larger, energy-rich, cold water plankton species have
14  been present in large numbers in 2007 and 2008.
    Therefore, ocean conditions in the broader California
15  Current appear to have been favorable for salmon
    survival in 2007 and to a greater extent in 2008, which
16  bodes well for Chinook salmon populations returning in
    2009 and 20103. These ecosystem indicators can be used
17  to provide an understanding of ocean conditions, and
    their relative impact on marine survival of juvenile
18  salmon, throughout the broader, northern portion of the
    California Current. However, they may not provide an
19  accurate assessment of the conditions observed on a
    more local scale off the California coast.
20
    Wells et al. (2008a) developed a multivariate
21  environmental index that can be used to assess ocean
    productivity on a finer scale for the central
22  California region. This index (also referred to as the
    Wells Ocean Productivity Index) has also tracked the
23  Northern Oscillation Index, which can be used to
    understand ocean conditions in the North Pacific Ocean
24  in general. The divergence of these two indices in 2005
    and 2006 provided evidence that ocean conditions were
25  worse off the California coast than they were in the
    broader North Pacific region. The Wells et al. (2008a)
26  index incorporates 13 oceanographic variables and
    indices and has correlated well with the productivity
27  of zooplankton, juvenile shortbelly rockfish, and
    common murre production along the California coast
28  (MacFarlane et al. 2008). In addition to its use as an

24

indicator of ocean productivity in general, the index may also relate to salmon dynamics due to their heavy reliance on krill and rockfish as prey items during early and later life stages. For instance, not only did the extremely low index values in 2005 and 2006 correlate well with the extremely low productivity of salmon off the central California coast in those years, but the index also appears to have correlated well with maturation and mortality rates of adult salmon from 1990-2006 in that region (Wells and Mohr 2008). Although not all of the data are currently available to determine the Wells et al. (2008a) index values for 2007 and 2008, there is sufficient information to provide an indication of the likely ocean conditions for those 2 years, which can then be compared to 2005 and 2006.

A review of the available information suggests ocean conditions in 2007 and 2008 have improved substantially over those observed in 2005 and 2006. For instance, the spring transition, which marks the beginning of the upwelling season and typically occurs between March and June, was earlier in 2007 and 2008 compared to 2005 and 2006. An early spring transition is often indicative of greater productivity throughout the spring and summer seasons (Wells and Mohr 2008, Peterson et al. 2006). Coastal upwelling, the process by which cool, nutrient rich waters are brought to the surface (perhaps the most important parameter with respect to plankton productivity), was also above average in 2007 and 2008. Moreover, coastal sea surface temperature and sea level height (representative of the strength of the California current and southern transport) values were also characteristic of improved ocean productivity (Wells and Mohr 2008). Thus, contrary to the poor ocean conditions observed in the spring of 2005 and 2006, the Wells et al. (2008a) index parameters available at this time indicate spring ocean conditions have been generally favorable for salmon survival off California in 2007 and 2008.

In contrast to the relatively "good" ocean conditions that occurred in the spring, the Wells et al. (2008a) index values for the summer of 2007 and 2008 were poor in general, and similar to those observed in 2005 and 2006. Summer sea surface temperature followed a similar pattern in both 2007 and 2008, starting out cool in June, and then rising to well above average in July before dropping back down to average in August (Wells and Mohr 2008). The strong upwelling values observed in the spring of 2007 and 2008 were not maintained throughout the summer, and instead dropped to either at or below those observed in 2005 and 2006. Finally, sea level height and spring curl values (a mathematical representation of the vertical component of wind shear

25

1       which represents the rotation of the vector field),
    which are negatively correlated with ocean
2       productivity, were both poor (Wells and Mohr 2008).
    Therefore, during the spring of 2007 and 2008, ocean
3       conditions off California were indicative of a
    productive marine environment favorable for ocean
4       salmon survival (and much improved over 2005 and 2006).
    However, those conditions did not persist throughout
5       the year, as Wells et al. (2008a) index values observed
    in the summer of 2007 and 2008 were similar to those
6       experienced in the summer of 2005 and 2006, 2 years
    marked by extremely low productivity of salmon off the
7       central California coast.

8       Evidence exists that suggests early marine survival for
    juvenile salmon is a critical phase in their survival
9       and development into adults. The correlation between
    various environmental indices that track ocean
10      conditions and salmon productivity in the Pacific
    Ocean, both on a broad and local scale, provides an
11      indication of the role they play in salmon survival in
    the ocean. Moreover, when discussing the potential
12      extinctions of salmon populations, Francis and Mantua
    (2003) point out that climate patterns would not likely
13      be the sole cause but could certainly increase the risk
    of extinction when combined with other factors,
14      especially in ecosystems under stress from humans.
    Thus, the efforts to try and gain a greater
15      understanding of the role ocean conditions play in
    salmon productivity will continue to provide valuable
16      information that can be incorporated into the
    management of these species and should continue to be
17      pursued. <u>However, the highly variable nature of these</u>
<u>environmental factors makes it very difficult, if not</u>
18  <u>impossible, to accurately predict what they will be</u>
<u>like in the future. Because the potential for poor</u>
19  <u>ocean conditions exists in any given year, and there is</u>
<u>no way for salmon managers to control these factors,</u>
20  <u>any deleterious effects endured by salmonids in the</u>
<u>freshwater environment can only exacerbate the problem</u>
21  <u>of an inhospitable marine environment. Therefore, in</u>
<u>order to ensure viable populations, it is important</u>
22  <u>that any impacts that can be avoided prior to the</u>
<u>period when salmonids enter the ocean must be carefully</u>
23  <u>considered and reduced to the greatest extent possible</u>.

24  (footnote omitted).

25      Plaintiffs argue that the BiOp fails to "thoroughly analyze

26  the <u>primary importance of recent ocean conditions</u> on the decline

27  of the listed species."  Doc. 263 at 10.  Document 10, a 1998

28

article by Gustavo A. Bisbal and Willis E. McConnaha, concludes that the ocean, not freshwater, conditions <u>primarily</u> determine overall salmon abundance.  Document 11, a 2008 brief by Randy Ericksen, demonstrates that take of Chinook salmon in ocean fisheries is far more significant than take through entrainment. Document 12, a stock assessment and fishery evaluation report prepared by the Pacific Fisheries Management Council in collaboration with scientists from various federal and state agencies, including NMFS, the Southwest Fisheries Science Center, and the California Department of Fish and Game, illustrates the extent to which the ocean environment has been unfavorable to salmon, noting the precipitous decline in sardine, anchovy, and krill populations –- all of which were key prey items of Pacific salmonid during the same years.

The BiOp does address, albeit indirectly, the relative importance of ocean conditions vis-a-vis freshwater conditions by concluding that, because ocean conditions vary from year to year and because there is nothing managers can do to address ocean conditions, the conditions salmonids face before they reach the ocean must be "carefully considered."  *See* BiOp at 152-53 (quoted with emphasis above).  Essentially, the BiOp concludes that whether or not ocean conditions are the "primary" cause of salmonid decline is largely irrelevant to an evaluation of whether coordinated project operations cause jeopardy.  However,

the BiOp does rely in part on comparisons of export levels at the juvenile stage against escapement from the ocean two years later to justify the imposition of certain export restrictions.  BiOp Appendix 5 at 21.  Whether reliance on such a comparison is reasonable may turn in part on the relative importance to the population of ocean conditions vis-à-vis freshwater influences at the juvenile stage.  The BiOp's failure to address squarely this issue justifies supplementation of the record with Documents 10, 11, and 12 under the relevant factors exception.

Document 23 is a technical memorandum that interprets and explains a critical study by Lindley that is already in the record.  Given that the study upon which Document 23 focuses is already in the record, Plaintiffs have not explained why Document 23 raises a relevant factor that was not considered or explains complex or technical information.  It is Plaintiffs' burden to demonstrate that the existing record is inadequate.

Plaintiffs' request to supplement the record is GRANTED as to Documents 10, 11, and 12, and DENIED as to 23

                    (2)   Documents Pertaining to CVP/SWP Operations
                          (Documents 5, 6, and 36).

                          (a)   Documents 5 and 6.

Document 5 is a 2005 report by Manly for Westlands Water District, entitled "Some further analysis of the Paired Release-Recovery Data."  Document 6 is a 2004 report prepared by Newman for FWS, entitled "Assessing an export effect on releases of

1   Chinook salmon smolts from Ryde."

2       Plaintiffs' entire argument for the admission of these

3   documents under one of the exceptions to the record review rule

4   states:

5           [] Documents 5 and 6 are necessary to explain the
6           technical terms and complex subject matter central to
            Plaintiffs' assertion that the 2009 BiOp fails to
7           rationally relate impacts of the CVP and SWP to
            population level effects of the endangered and
8           threatened species.  Kern County Water Agency's
            Complaint for Declaratory and Injunctive Relief, 17:6-
9           7, Aug. 26, 2009 (Doc. 1) ("The 2009 BiOp fails to
            consider available scientific and commercial data
10          suggesting there is little evidence of any association
            between exports and salmon survival.").  Specifically,
11          both documents are necessary to explain the
            insignificance of any effects on the salmon population
12          from Delta cross-channel operations.  Consideration of
            this literature would prove extremely useful to explain
13          NMFS's overestimation of the risk of direct effects of
            project operations, and to compare with existing agency
14          analysis to determine whether NMFS in fact included all
            relevant factors in reaching its jeopardy conclusion.

15  Documents 140 at 20.  Plaintiffs' belief that "consideration of

16  this literature would prove extremely useful" is insufficient.

17

18  The Court is not required to scour the record in support of

19  Plaintiffs' motion to supplement.

20      Plaintiffs' motion to supplement the record with Documents

21  5, 6, and 36 is DENIED.

22

23              (b)  Document 36.

24      Plaintiffs' showing with respect to Document 36, a study

25  dated April 2, 2009, entitled "Estimating survival and migration

26  route probabilities of juvenile Chinook salmon in the Sacramento-

27  San Joaquin Rover Delta," is more robust.  Plaintiffs argue that

28
                                  29

Document 36 should be admitted under the relevant factors

exception because:

> Document 36 is a study that discusses how movements
> among, and survival within migration routes interact to
> influence population-level survival of salmon smolts
> through the Delta.  The study develops a model for the
> Delta to estimate the probability of juvenile salmon
> migrating through each of four migration routes and the
> probability of surviving through each route.  The study
> uses the first available acoustic telemetry data of
> smolt migration through the Delta and provides the
> first quantitative glimpse into migration dynamics of
> juvenile salmon smolts in the Sacramento River and
> examines how different components interact to affect
> survival of the population migrating through the Delta.
> This article is co-authored by a NMFS biologist and was
> therefore was available to NMFS at the time of the
> BiOp.  In addition, this study uses first available
> data and for the first time presents quantitative
> information regarding population level survival through
> the Delta.  This data is not otherwise presented in the
> AR, but it is important in determining what effects the
> projects may have on salmon migrating through the
> Delta. ***

Doc. 140 at 19.

    Plaintiffs emphasize that the copy they submitted as part of

their motion to augment was dated April 2, 2009, two months

before the BiOp was published.  Moreover, two of the seven

authors are NMFS biologists.  Federal Defendants maintain that

this study was not available to the agency within a reasonable

time before completion of the BiOp because it was not published

until after January 2010.  Plaintiffs have not demonstrated that

this study was before the agency prior to the issuance of the

BiOp.

    Plaintiffs alternatively argue that this document "explains

migration routes and timing of migration and therefore aids the

1    Court's understanding of salmon migration."  But, Plaintiffs have

2    not demonstrated that the present record insufficiently describes

3    salmon migration.

4         Plaintiffs' request to supplement the AR with Document 36 is

5    DENIED.

6

7                   (3)   Documents Concerning Biostatistics /
                          Viability Analysis (Documents 3, 7, 8, 14,
8                         37, and 38).

9                   (a)   Best Available Science Argument.

10        Plaintiffs first assert that the administrative record

11   should be supplemented with Documents 3, 7, 8, 14, 37, and 38

12   because "material in those documents represents 'best available

13   science' that was ignored or given insufficient weight by Federal

14   Defendants."  In support of this decision, Plaintiffs cite a

15   December 16, 2009 Memorandum Decision in the *Delta Smelt*

16   *Consolidated Cases*, 1:09-CV-00407, Docket 462.  That decision

17   explained that expert testimony is required to determine whether

18   a particular study represents "best available science" that was

19   disregarded or given insufficient weight. *See id.* at 14-15.  No

20   such expert testimony has been presented as part of Plaintiffs'

21   motion to augment.  This is a failure of proof.  The motion is

22   DENIED WITHOUT PREJUDICE on this ground.

23

24                   (b)   Relevant Factors Argument.

25        Plaintiffs next argue that Documents 3, 7, 8, 14, 37, and 38

26   are necessary to demonstrate that Federal Defendants did not

consider all relevant factors and did not explain their decision.

Document 3, is a 2008 analysis of "Chinook prey availability and biological requirements in Coastal Range of Southern Residential re: Supplemental Comprehensive Analysis of Southern Resident killer whales."  Without any explanation, Plaintiffs assert that this analysis "demonstrates that Federal Defendants did not consider all relevant factors prior to reaching its jeopardy conclusion with respect to the Southern Resident killer whale."  Docket 263 at 12.  This is an insufficient showing.

Document 7 describes a quantitative modeling approach adopted by the Interior Columbia Technical Recovery Team ("ICTRT") to evaluate productivity and abundance of Columbia River salmonids.  Plaintiffs suggest that the record should be supplemented to include Document 7 because NMFS acknowledged in the BiOp the benefit this type of quantitative modeling "towards understanding the relative importance of proposed action-related effects at various life stages on overall abundance," BiOp at 67, yet the BiOp failed to perform any quantitative analysis.  Plaintiffs' attempt to admit this document under the "relevant factors" exception is misplaced.  The BiOp does acknowledge the value of quantitative population modeling.  Whether or not the ICTRT modeling approach represents best available science that could have been applied to the Central Valley salmonids but was not is a separate question.  Admissibility of this document must

be supported by expert testimony.  It has not been.

Document 8 is the Biological Opinion for the Federal Columbia River Power System.  Plaintiffs maintain that "[t]his document demonstrates the appropriate timeline for assessing viability of a subject species, which should be equal to the amount of time for which take coverage or recovery efforts will be provided, in that instance, 24 years."  Docket 263 at 14.  According to Plaintiffs:

> NMFS applied a long-term, 100-year standard to evaluate extinction risk based on the Viability Salmonid Population ("VSP") framework. BiOp at 42, 51.  By using VSP parameters, however, the BiOp erroneously required the Project's effects to meet a more stringent long-term recovery goal, that being if the risk to recovery under baseline and Project conditions is greater than 5 percent over 100 years, the BiOp concludes that the recovery prong cannot be met.  This long-term recovery goal is in contrast to similar biological opinions that evaluate recovery over a much shorter time period to be consistent with the legal standard articulated in *National Wildlife Federation v. National Marine Fisheries Service,* 524 F.3d 917 (9th Cir. 2007).  Document 8 was therefore provided to show that extinction risk is typically considered over a much shorter period than that adopted in the BiOp, typically the length of the take coverage for the proposed action.

*Id*.  Again, this is a highly technical argument that goes to the use of the best available science.  Admissibility of this document must be supported by expert testimony.  It has not been.

Document 14 is an article by Stephen P. Cramer, which demonstrates that the primary native run of steelhead to the Sacramento Basin, upstream of the Feather River, was summer steelhead, not winter steelhead.  Plaintiffs argue that "NMFS' discussion of steelhead completely overlooks this evidence as

33

demonstrated by NMFS's...assertion that '[o]nly winter steelhead are currently found in Central Valley rivers and streams.'  BiOp at 104."  Docket 140 at 21.  The BiOp does not discuss the possibility that there may have been or currently may be another run of steelhead present in the upper Sacramento River basin. Although the significance of this failure is far from clear, Document 14 is admissible to demonstrate the BiOp's failure to consider this factor.

The BiOp concludes that the CVP and SWP operations are likely to jeopardize the existence of the Southern Resident killer whale ("Southern Resident") because the project operations jeopardize the Southern Resident's predominant prey, the Chinook salmon.  BiOp at 489, AR 00106569.  The BiOp states that from May to September, the Southern Resident's diet consists of 86 percent Chinook salmon and from May to December, their diet consists of 69 percent Chinook salmon.  BiOp at 163, AR 00106243.

Document 37, McCluskey 2006, analyzes the relationship between Southern Resident behavior and abundance and prey availability.  Plaintiffs offer extensive argument why this study should be admitted to demonstrate that Federal Defendants failed to consider a relevant factor:

> This study is unique due to its analytical approach,
> level of detail, and the study's extended time frame—
> all of which yield detailed results that challenge the
> dominant literature's (i.e. the documents already part
> of the NMFS Record) assumptions about Southern Resident
> behavior in response to prey availability and may call
> into question assumptions (like those made in the BiOp)

1          about Southern Resident dietary requirements during
           winter months in coastal waters, including those in the
2          action area.

3          McCluskey 2006 examines two distinct lines of inquiry
           to document the relationship between the Southern
4          Resident and its prey.  First, McCluskey 2006 models
           the space use of Southern Resident SRC and links that
5          movement behavior to variables such as population
           trends and relative prey availability (salmon).
6          Specifically, McCluskey 2006 documents the results of a
           series of spatial pattern analytical approaches used to
7          investigate variations in shape and size of pod
           movement behavior between and within salmon management
8          areas.  <u>This line of inquiry yields results that
           challenge conventional views about the movement</u>
9          <u>behavior of the Southern Resident and, for example,
           areas with high densities of salmon.</u>  McCluskey
10         suggests that these results may indicate that whales do
           not preferentially occupy areas of higher salmon
11         density and may be distributing themselves based on
           other factors such as alternative prey species (p. 76).
12         See Final Recovery Plan for the Southern Resident
           Killer Whales (NMFS 2008) at II-29 (noting McCluskey
13         2006 counters the theory that the Southern Resident
           seek out and forage in areas in which salmon most
14         commonly occur).

15         McCluskey 2006 also compares trends in Southern
           Resident abundance to total abundance and escapement of
16         Pacific salmon.  The study compares abundance at
           different temporal and spatial scales over a 10-year
17         period using variables including pod, salmon species,
           and time-lag.  Again, the study yields new results that
18         must be accommodated in the broad generalizations about
           SRC dietary requirements.  For example, McCluskey notes
19         that, "[c]ontrary to observational and scale sampling
           evidence of chinook predation" when escapement data
20         were used no significant correlations between total
           chinook and total Southern Resident were found (p.
21         100).

22         <u>The data and analysis presented in McCluskey 2006 is
           not found elsewhere in the Record and it provides</u>
23         <u>critical additional information regarding the Southern
           Resident's diet and abundance as it is related to prey</u>
24         <u>availability, key factors in the BiOp's analysis and
           jeopardy conclusion.</u>  Furthermore, McCluskey 2006
25         explains movement behavior of the Southern Resident and
           trends in abundance.
26
   Docket 140 at 18.  Plaintiffs insist that this document "raises
27
   questions regarding the BiOp's assertions about the Southern
28
                                  35

Residents' reliance on Chinook salmon."  Docket 263 at 15.  This is insufficient to justify supplementation under the relevant factors exception.  NMFS has a duty to consider the best available science.  However, expert testimony is required to demonstrate that Document 37 is best available science that was ignored or given insufficient weight.  The motion is DENIED WITHOUT PREJUDICE as to Document 37.

Document 38, presents a critique of Lindley et al (2007), a document cited numerous times in the BiOp, *see, e.g.,* BiOp at 68, 88, 108, 486, and relied upon "to establish the current status of the listed Central Valley salmon and steelhead species," and "to evaluate whether the proposed action does not 'reduce appreciably the likelihood of survival and recovery.'"  Lindley et al (2007) directly adopts and applies the criteria from Allendorf et al (1997).  Document 38 directly critiques the criteria used in Allendorf (1997) on the ground that these criteria are based on assumptions that are seldom true for Pacific salmon.  Plaintiffs maintain that because Document 38 "presents an evaluation of the criteria upon which the BiOp's jeopardy analysis is based, [it's admission] is necessary to determine whether the agency considered all relevant factors.  Plaintiffs misapply the relevant factors exception.  Document 38 does not point out a factor the BiOp failed to consider.  Rather, it raises a scientific dispute over the merits of assumptions made in the

1   BiOp.  If expert testimony can establish that Document 38

2   represents the best available science that was ignored or

3   disregarded, it may be considered for that purpose, but it is not

4   admissible under the relevant factors exception.  Plaintiffs'

5   alternative argument that Document 38 is admissible as necessary

6   to explain complex scientific information is not supported by any

7   showing that the current record does not sufficiently explain

8   extinction risk and population assessment.  Plaintiffs' cannot

9   use this exception to gain admission of otherwise inadmissible

10  documents.

11
        Plaintiffs' request to supplement the record is DENIED as to

12  Documents 3, 7, 8, 37 and 38 and GRANTED as to Document 14.

13
                    (4)   Document Concerning RPA (Document 32).

14
        Document 32 is Reclamation's 2009 Technical Memorandum on

15  the Effectiveness of a Non-Physical Fish Barrier at the

16  Divergence of the Old and San Joaquin Rivers.  Document 32

17  summarizes the results of the "bubble barrier" experiment that

18  was conducted during the VAMP period in April-May 2009, before

19  the BiOp was issued.  Conceptual studies of the bubble barrier

20  are included in the record, *see, e.g.,* NMFS AR at 58472, 73147,

21  73172, and it was also discussed among NMFS staff, *see, e.g.,*

22  NMFS AR at 61049, 61059, 65222.  However, Document 32, issued in

23  September 2009, post-dates the BiOp.  That Document 32

24  "summarizes the results" of other studies in the AR does not

25

26

27

28

justify its admission under any of the narrow exceptions, as it could not have been considered by the decisionmaker prior to the issuance of the BiOp.

Plaintiffs' motion is DENIED as to Document 32.

4.   <u>Stanislaus Plaintiffs' Motion to Supplement.</u>

Federal Defendants have agreed to include in the record most of the Documents requested by Stanislaus River Plaintiffs.  Only seven (7) documents in Table E attached to Stanislaus River Plaintiffs' motion to supplement remain in dispute.

B.   <u>San Luis Plaintiffs' Motion to Augment With Documents Withheld Under Claim of Privilege.</u>

1.   <u>Stanislaus Weir data for 04/05, 05/06, 07/08 (Table E – Items 19, 21 and 22) and Rotary Screw Trap data 1993-present (Table E – Item 16)</u>

The Stanislaus River Weir data is collected from fishery studies on the Stanislaus River.  Only select years of the weir data are included in the AR.  Similar gaps exist in the Rotary Screw Trap data included in the AR.  Stanislaus River Plaintiffs seek to include the remaining years of data in the AR.  Federal Defendants refuse, arguing that the data was not created by the Bureau, the missing years cannot be found in USBR's files, and the missing data was not considered or relied upon by the agency. Doc. 227 at 7:23-8:5.

However, Federal Defendants considered certain years from these data sets, which represent the only available studies of certain species on the Stanislaus River, relevant enough to be

38

included in the AR.  Federal Defendants' failure to consider the other years is arguably a failure to consider a relevant factor (i.e. a failure to consider a complete data set).  The missing years of data, Items 16, 19, 21 and 22 are admissible for this purpose.

   2.   <u>SJRGA Temperature Comments and Attached Data (Table E, Item 23).</u>

   Item 23 relates to the Central Valley Regional Water Quality Board's ("Regional Board") consideration of Temperature Water Quality Standards for the protection of anadromous fish in the Merced, Stanislaus, Tuolumne, and San Joaquin Rivers.  The Regional Board took comments from interested parties and stakeholders.  Oakdale Irrigation District and South San Joaquin Irrigation District submitted comments as part of this process, as did others, including the California Department of Fish and Game ("CDFG").  NMFS included CDFG's comments in the record, but not the comments submitted by Oakdale and South San Joaquin Irrigation Districts, which included 90 pages of biological and temperature modeling data.  NMFS insists that Item 23 was not before the decisionmaker and therefore should not be part of the record.

   Plaintiffs argue that the information contained in Item 23 was publicly available and directly relates to the temperature issues on the Stanislaus River.  Doc. 260 at 5.  However, neither of these arguments suggests why this data should come in under

any of the recognized exceptions to the record review rule, if NMFS may exercise its discretion not to consider the data, unless expert testimony shows this was a violation of the best available science requirement because the data was non-cumulative and necessary.

Plaintiffs' request to supplement the record with Item 23 is DENIED WITHOUT PREJUDICE.

3.   <u>Stanislaus River Temperature Model - Table E, Item 14.</u>

The BiOp imposes significant new temperature requirements on Stanislaus River operations.  Plaintiffs seek to supplement the AR with the CALFED San Joaquin River ("SJR" Water Temperature Model (Item 14 on Table E).  The Stanislaus River Plaintiffs submit the Declaration of Avry Dotan, a hydrologist who participated in the development of the CALFED SJR Water Temperature Model.  See Doc. 148 at ¶2.  According to Mr. Dotan, the model was developed as part of a stakeholder-driven process to analyze the relationship between operational alternatives, water temperature regimes and fish mortality on the Stanislaus River.  *Id*. at ¶3.  The stakeholder group included Reclamation and the United States Fish and Wildlife Service.  The group funded the development of a preliminary version of the model. *Id*.  The success of the preliminary model prompted CALFED to fund an expanded version of the model, which has since been peer reviewed.  *Id*. at ¶4.  The model, which is designed to provide

40

basin-wide evaluation of temperature responses to operational and physical changes, has been used in several proceedings, including instream/temperature studies for the Stanislaus River, the Friant Restoration Projects; the Delta-Mendota Canal Recirculation Project, Tuolumne River instream studies, and Merced River hydropower relicensing. *Id*. at ¶7. Mr. Dotan maintains that a NOAA employee, Craig Anderson, contacted him in May of 2009 about running the SJR Water Temperature Model in connection with the preparation of the 2009 Salmonid BiOp, Mr. Dotan was never retained to perform such analysis. *Id*. at ¶8.

NMFS apparently utilized a different model, but has not completely disclosed the nature of the model used or the location of its results. At a minimum, Plaintiffs request that Defendants supplement the AR with the model employed and its results. To the extent that the modeling utilized is deficient, Plaintiffs' maintain that Mr. Dotan should be allowed to explain why the model is deficient and why the Stanislaus River Temperature model is the best available scientific evidence.

Stanislaus River Plaintiffs' request that Federal Defendants disclose the nature of the model used to develop the BiOp and the location of its result is GRANTED. If, upon review of this information, there is a basis in the record for Mr. Dotan to opine that the model used does not represent the best available science and that the Stanislaus River Water Temperature Model

does, such opinions will be considered for that limited purpose, and, if legally appropriate, the data will be consdiered.

4.   CALSIM II - Table E, Item 12.

Item 12 is the "Corrected San Joaquin River CALSIM II model."  The BiOp used an older version of the CALSIM II model. Plaintiffs maintain that the older version contained coding and assumption errors that affect how the model works during April and May, when any flow requirements imposed by the BiOp would interact with Vernalis flows set forth in applicable water rights decisions and the Vernalis Adaptive Management Program ("VAMP"). The Stanislaus River Plaintiffs request that the corrected SJR CALSIM model be added to the record.  In support of this motion, the Stanislaus River Plaintiffs offer the Declaration of Daniel B Steiner, a civil engineer with experience in hydrologic modeling. Mr. Steiner states that "[a]fter the release of the June 2009 BiOp, [h]e worked with [Reclamation] staff regarding [the] coding errors [in the older version of CALSIM II]."  Doc. 150 at ¶7. Mr. Steiner "understands that [Reclamation] has since corrected its model to address at least one of its errors.  *Id*.

Mr. Steiner's declaration indicates that a corrected version of the model was not available prior to the issuance of the BiOp, nor do Plaintiffs suggest that anyone pointed out any errors in the older CALSIM II model to Federal Defendants prior to the BiOp's issuance.

42

1    Plaintiffs' motion to supplement the record with Item 12 is

2    DENIED WITHOUT PREJUDICE.  If Plaintiffs' expert can demonstrate

3    that this corrected model represents "best <u>available</u> science"

4    that was disregarded or given insufficient weight, such opinions

5    will be considered.

6

7    C.    San Luis Plaintiffs' Motion to Augment the Record with
           Documents Withheld Under Claim of Privilege.
8
           1.    Documents 24 through 59.
9
           NMFS has agreed to disclosed Documents 24 through 59.  These
10
     documents shall be added to the administrative record.
11

12         2.    Documents Over Which Federal Defendants Assert the
                 Privilege.
13
           NMFS asserts the attorney client privilege to withhold
14
     Documents 1-9 and 60-63.  NMFS bears the burden of demonstrating
15
     the applicability of the privilege to each document.  *In re*
16
     *Fischel*, 557 F.2d 209, 212 (9th Cir. 1997).
17

18
           a.    Documents 1 through 9.
19
           Documents 1 through 9 are preliminary drafts of the BiOp,
20
     which contain substantive edits to, and comments by Melanie
21
     Rowland, an attorney in NOAA's Office of General Counsel.  NMFS
22
     asserts that the documents contain legal advice from Ms. Rowland
23
     on the legal issues raised by the BiOp.  NMFS explains:
24

25
                Not all of Ms. Rowland's suggested edits were
26              incorporated into the final biological opinion and for
                those edits that were, the challenged documents contain
27              privileged legal advice regarding the legal
                desirability of those edits, which are inextricably
28

                                    43

1   intertwined with the edits themselves.

2   Doc. 227-3, McInnis Decl., ¶7.

3       Plaintiffs cite *Greenpeace v. National Marine Fisheries*

4   *Serv.*, 198 F.R.D. 540, 542 (W.D. Wash. 2000), in which, after in

5   camera review, the agency was required to disclose several

6   documents over which the deliberative process privilege was

7   asserted.   Here, however, Federal Defendants rely on the

8   attorney-client privilege, arguing that it "is not possible to

9   disclose the information without revealing the attorney-client

10  privileged information."   *Greenpeace*, therefore, is only relevant

11  insofar as it stands for the undisputed proposition that *in*

12  *camera* review is a useful tool for resolving whether the

13  assertion of a privilege is valid.

14      It is impossible to determine the propriety of Federal

15  Defendants' assertions of privilege without examining these

16  documents, although the facial explanations appear valid.   In an

17  abundance of caution, Federal Defendants shall submit these four

18  documents under seal for the court's in camera review.

19

20          b.   Documents 60-63.

21      Federal Defendants also assert the attorney client privilege

22  with respect to Documents 60-62, and the work product privilege

23  for Documents 60-63, all of which are described in the NMFS

24  Record Index as "Cliff Notes" from various internal Operations

25  Criteria and Plan ("OCAP") meetings.

26
27
28                              44

As to the attorney-client privilege, federal Defendants claim that these Documents "contain internal discussions in which legal advice from NOAA attorneys (Christopher Keifer; Melanie Rowland) is repeated and discussed among non-attorneys for the specific purposes of litigation strategy and compliance with the court's order in *PCFFA v. Gutierrez*. Plaintiffs object that NMFS does not identify any specific information about the documents, nor do they explain how non-disclosure of these documents would serve the purpose of the attorney-client privilege: to promote the "full and frank communication between attorneys and their clients." *Upjohn Co. v United States*, 449 U.S. 383, 389 (1981). Plaintiffs request that the assertion of the privilege be rejected or that the documents be submitted for *in camera* review.

Federal Defendants' basis for assertion of the work product privilege is the same as for the attorney client privilege. However, San Luis Plaintiffs correctly point out that the work product privilege is a qualified one, which may be overcome if the requesting party can demonstrate that it "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). The privilege is held by the attorney. Without knowledge of their content, San Luis Plaintiffs claim they have a substantial need for these documents because they pertain to the development of the BiOp, which

45

1    addresses the OCAP's effects on listed species.

2         Again, although the facial explanations appear valid, in an

3    abundance of caution, Federal Defendants shall submit these four

4    documents under seal for the court's in camera review.

5

6

7                        III. <u>CONCLUSION</u>

8         Consistent with the reasoning set forth above:

9         (1) As to the motions to supplement:

10             (a) San Luis Plaintiffs' request to supplement the

11             record with

12                 (i) Documents 1-14 on the ground that they were

13                 attached to comment letters is DENIED;

14                 (ii) Document 21, a compilation of declarations

15                 referenced in the BiOp, is GRANTED;

16

17                 (iii) Documents 1, 4, 9, and 39-41 is DENIED

18                 WITHOUT PREJUDICE;

19                 (iv) Documents 2 and 24-31 is DENIED WITHOUT

20                 PREJUDICE;

21                 (v) Document 13 is DENIED;

22

23                 (vi) Documents 34 and 35 is GRANTED for the

24                 purpose of demonstrating that Federal Defendants

25                 failed to consider a relevant factor, namely the

26                 impact of hatchery fish on salmonid fitness;

27

28

                                46

(vii) Documents 10 and 11 is GRANTED for the

purpose of demonstrating that Federal Defendants

failed to consider a relevant factor, the

purported primacy of the impact of ocean

conditions on salmonid survival;

(viii) Document 23 is DENIED;

(ix) Documents 5 and 6 is DENIED;

(x) Document 36 is DENIED;

(xi) Documents 3, 7, 8, 14, 37, and 38, as

representing the best available science, is DENIED

WITHOUT PREJUDICE;

(xii) Documents 14 is GRANTED for the purpose of

demonstrating that Federal Defendants failed to

consider a relevant factor, namely the past or

current existence of a different steelhead run in

the action area;

(xiii) Documents 3, 7, 8, 37 and 38 is DENIED as

to the relevant factors and explanation of complex

scientific information exceptions; and

(ixx) Document 32 is DENIED;

(b) Stanislaus River Plaintiffs' motion to supplement

is GRANTED as to Items 16, 19, 21 and 22 and DENIED

WITHOUT PREJUDICE as to Items 12 and 23.

1     (c) Stanislaus River Plaintiffs' request that Federal

2     Defendants disclose the nature of the model used to

3     develop the BiOp and the location of its result is

4     GRANTED.

5  (2) As to the motion to augment, Federal Defendants shall

6     (a) disclose documents 24 through 59; and

7     (b) lodge Documents 1-9 and 60-63 under seal for in

8     camera review within five (5) days of service of this

9     order.  Given the length of the BiOp, Federal

10    Defendants may elect to lodge any or all of these

11    documents on CD in lieu of hard copies.

12  Plaintiffs shall submit a form of order consistent with this

13  memorandum decision within five (5) days of electronic service.

14

15

16

17  SO ORDERED

18  Dated:   June 21, 2010

19                              /s/ Oliver W. Wanger
                               Oliver W. Wanger
20                             United States District Judge

21

22

23

24

25

26

27

28

**48**